155 P.3d 140 (2006)
Michael Andrew OLIVER, doing business as Hydrogear, a sole proprietorship, Appellant,
v.
FLOW INTERNATIONAL CORPORATION, Respondent.
No. 57382-9-I.
Court of Appeals of Washington, Division 1.
December 18, 2006.
Publication Ordered April 5, 2007.
*141 Parker C. Folse III, Drew D. Hansen, Susman Godfrey LLP, Seattle, WA, Bert P. Noojin, Attorney at Law, Mobile, AL, David A. Bagwell, Attorney at Law, Fairhope, AL, for Appellant.
David Thomas McDonald, David Andrew Linehan, Kirkpatrick & Lockhart Preston Gates Ellis, LLP, Seattle, WA, for Respondent.
BECKER, J.
¶ 1 Michael Oliver signed a fully integrated contract giving Flow International Corporation all of the rights to his invention in exchange for at least $150,000 and the possibility of royalties. Three years later, Flow had not sold the invention and consequently there were no royalties. Oliver sued for breach of contract on the ground that Flow's efforts to patent, manufacture, and market the invention were inadequate. The trial *142 court properly granted Flow summary judgment because the contract did not, even implicitly, require Flow to patent, manufacture, or market the invention.

FACTS
¶ 2 Oliver, an Alabama inventor, approached Flow in 1999 with an invention he called a Robot. Flow is a Kent corporation that designs and manufactures ultra-high-pressure water jet technology. Oliver's Robot was designed to clean the inside of horizontal vessels such as industrial tanks and railroad tank cars. With such a device, humans would not have to enter those vessels and be exposed to dangerous fumes.
¶ 3 Doing business as Hydrogear, his sole proprietorship, Oliver offered to sell Flow all rights to the Robot for $15 million. After extensive negotiations, the parties agreed to preliminary terms stated in a signed "Term Sheet" in June 2001. Under the Term Sheet, Flow would make a $150,000 up-front payment, but would have to pay nothing else unless it sold Robots. The parties entered into a final contract on June 25, 2001, essentially identical to the Term Sheet. In the contract, entitled "Design Purchase Agreement", Hydrogear agreed to give up "all of its rights to the Robot":
1. Purchase of the Robot. Hydrogear does hereby sell, transfer and assign to Flow all rights to the Robot. Hydrogear agrees that any patents, patent applications, trademarks, copyrights or other rights associated with the Robot are included in the sale and does hereby assign all such rights to Flow and to cooperate with Flow in pursuing any patents related to the Robot. Hydrogear agrees they will cooperate with Flow in transferring the design of the Robot to Flow and that it will assist Flow in developing drawings and technical specifications necessary for the manufacture of the Robot.
¶ 4 In consideration for receiving the rights to the Robot, Flow agreed to pay Hydrogear $100,000 on the execution of the final contract; $50,000 more on completion and delivery of a prototype Robot, together with reimbursement for Hydrogear's reasonable manufacturing costs; and $50,000 after Flow sold its first Robot. Flow also promised to pay Hydrogear certain royalties on the sale of Robots and associated gear for the 17 years after the date of the final contract. If Flow permanently ceased to manufacture or market the Robot, the contract would terminate:
4. Termination. In the event Flow permanently ceases to manufacture or market the Robot in the 17 years following the date of this Agreement, Flow agrees that it shall transfer all rights to the Robot back to Hydrogear and shall assign any associated patents to Hydrogear. In such event, Flow's obligations to pay royalties hereunder shall cease.
¶ 5 The contract also contained an integration clause: "This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof."
¶ 6 Oliver delivered a prototype Robot. Flow paid Oliver $150,000, as required by the contract. Flow made some efforts to market the Robot, but it did not ever sell one, and it did not attempt to patent the Robot. According to the parties, no patent is now possible because no patent application was filed within one year from the time Oliver first publicly displayed the Robot.
¶ 7 Oliver sued Flow in June 2004 for breach of contract and promissory estoppel. Flow successfully moved for summary judgment on these claims. Oliver appeals.

BREACH OF CONTRACT
¶ 8 Summary judgment is appropriate only where there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. CR 56(c). Review is de novo. Hearst Commc'ns, Inc. v. Seattle Times, 154 Wash.2d 493, 501, 115 P.3d 262 (2005).
¶ 9 Oliver contends Flow breached the contract by failing to make reasonable efforts to patent, manufacture, and market the Robot.
¶ 10 Washington follows the "objective manifestation" theory of contracts. This means that we "impute an intention corresponding to the reasonable meaning of the words used", and "give words in a contract *143 their ordinary, usual, and popular meaning unless the entirety of the agreement clearly demonstrates a contrary intent." Hearst, 154 Wash.2d at 503-504, 115 P.3d 262. "We do not interpret what was intended to be written but what was written." Hearst, 154 Wash.2d at 504, 115 P.3d 262.
¶ 11 Oliver cites several different portions of the final contract and claims that, taken together, they express an intention to obligate Flow to patent, manufacture, and market the Robot. For example, the contract states Hydrogear's agreement "to cooperate with Flow in pursuing any patents related to the Robot", and it spells out what would happen if Flow "permanently ceases to manufacture or market the Robot".
¶ 12 But while these phrases show that Flow intended to patent, manufacture, market the Robot, they do not indicate Flow's intent to be bound to do so. This was a contract of sale. Flow did not buy the right to sell the Robot on Oliver's behalf; Flow bought "all rights" to the Robot.
¶ 13 To prove the intent of contracting parties, a party may offer extrinsic evidence of the context surrounding an instrument's execution. Berg v. Hudesman, 115 Wash.2d 657, 667, 801 P.2d 222 (1990). But extrinsic evidence is relevant only to determine the meaning of specific words and terms used, not to show an intention independent of the instrument or to vary, contradict or modify the written word. Hearst, 154 Wash.2d at 503, 115 P.3d 262. Oliver offers extrinsic evidence of negotiations leading up to the final agreement. He contends the evidence illuminates certain terms in the contract, such as Flow's obligation to pay royalties and its obligation to return the rights to the Robot upon ceasing to manufacture it. He further contends these terms, so illuminated, all presuppose or assume or contemplate that Flow would patent, manufacture and market the Robot, and therefore they support an interpretation that the contract actually bound Flow to do so. This is an improper use of extrinsic evidence because the result Oliver seeks is to insert new obligations into the contract. The express terms of the contract do not create the obligation Oliver now attempts to impose, even in light of the context in which the agreement arose. We conclude Oliver has not established breach of any express provision in the contract.
¶ 14 Oliver next contends the duty to make reasonable efforts to patent, manufacture, and market the Robot is implicit in the contract.
¶ 15 Implied covenants are not favored in the law. Brown v. Safeway Stores, 94 Wash.2d 359, 370, 617 P.2d 704 (1980). Courts will not imply a covenant unless five requirements are satisfied:
(1) the implication must arise from the language used or it must be indispensable to effectuate the intention of the parties;
(2) it must appear from the language used that it was so clearly within the contemplation of the parties that they deemed it unnecessary to express it; (3) implied covenants can only be justified on the grounds of legal necessity; (4) a promise can be implied only where it can be rightfully assumed that it would have been made if attention had been called to it; (5) there can be no implied covenant where the subject is completely covered by the contract.
Brown, 94 Wash.2d at 371, 617 P.2d 704 (quoting Cousins Inv. Co. v. Hastings Clothing Co., 45 Cal.App.2d 141, 113 P.2d 878 (1941)).
¶ 16 These requirements are not satisfied here. In particular, Oliver fails to show a legal necessity to imply an obligation on Flow's part to patent, make, and sell the Robot. Typically, a term is implied in order to supply consideration, without which there would not be a valid contract. Here, the contract was supported by $150,000 in consideration that was in no way dependent on future sales. In that respect, this case is materially different than the cases Oliver relies on. See, e.g., Wood v. Lucy, Lady Duff-Gordon, 222 N.Y. 88, 118 N.E. 214 (1917) (exclusive right to use the Duff-Gordon name implied dealer's promise to use best efforts because "Unless he gave his efforts, she could never get anything.").
¶ 17 One federal case cited by Oliver does find an implied obligation in a contract that is *144 otherwise supported by consideration: Perma Research & Dev. Co. v. Singer Co., 402 F.Supp. 881 (S.D.N.Y.1975), aff'd, F.2d 111 (2d Cir.1976). But Perma is not persuasive in Washington because our courts do not imply an obligation in the absence of legal necessity. And Perma has not been influential in federal courts either. See, e.g., Permanence Corp. v. Kennametal, Inc., 908 F.2d 98, 102-103 (6th Cir.1990) (Perma "misapplied the doctrine first articulated in Wood v. Lucy, Lady Duff-Gordon where it was necessary to imply `best efforts' in order to provide mutuality of obligation to save the agreement.").
¶ 18 In Permanence, a case with similar facts, the court refused to imply a covenant by a manufacturer to use best efforts to exploit certain patents:
In the present case, we do not believe that Kennametal impliedly promised to perfect an incompletely developed technology, which is what plaintiff, in effect, asserts. The total payment of $250,000 for the exclusive license to the patents provided sufficient incentive and demonstration of good faith that Kennametal would attempt to commercialize and market the Permanence process. This is not a case where the licensor (Permanence) depended for its sole compensation for the licensed patents upon royalties generated by the exclusive agency granted to Kennametal. The implication of a best efforts obligation is therefore not necessary to establish mutuality of obligation. Moreover, we find that if Permanence wished to bind Kennametal to a best efforts commitment in the circumstances of the present case, it was incumbent upon Permanence to spell out this obligation in the formal written agreement.
Permanence, 908 F.2d at 103 (emphasis added).
¶ 19 The trial court in this case similarly rejected Perma Research as being "at odds" with the majority rule:
the original case that nearly every state has followed is the Lucy, Lady Duff-Gordon case. . . . And in that case, the reasoning and motivation for it was absent an implied obligation there would be absolutely no compensation to her for having given up the exclusive right to market her product.
The trial court's analysis correctly follows the rule that, absent legal necessity, courts will not imply obligations into contracts.
¶ 20 Oliver contends "legal necessity" as used in Brown merely refers to the need to give effect to the parties' intentions. But that requirement is already stated in Brown's first factor: the implication must be indispensable to effectuate the intention of the parties. The legal necessity requirement means something else, namely that a court will find an implied obligation only to save an otherwise invalid contract. Typically this means a contract otherwise lacking in consideration. Because Oliver received substantial consideration in exchange for selling the Robot to Flow, his attempt to imply a further "best efforts" obligation must fail.
¶ 21 In summary, Oliver has failed to raise an issue of material fact warranting a trial of his claim for breach of contract.

PROMISSORY ESTOPPEL
¶ 22 Also dismissed on summary judgment was Oliver's claim of promissory estoppel. A promissory estoppel claim requires five showings: (1) a promise, (2) that the promisor should reasonably expect to cause the promisee to change his position, and (3) actually causes the promisee to change his position, (4) justifiably relying on the promise, (5) in such a manner that injustice can be avoided only by enforcement of the promise. Flower v. T.R.A. Indus., Inc., 127 Wash.App. 13, 31, 111 P.3d 1192 (2005).
¶ 23 No promissory estoppel claim can succeed unless the promisor should have reasonably expected his promise to cause the promisee to change his position. Flower, 127 Wash.App. at 31, 111 P.3d 1192. Flow could not have reasonably expected Oliver to believe the alleged initial promises by Flow were still in force after the execution of the integrated contract in which those promises were noticeably absent, and which gave Oliver substantial consideration in exchange for "all rights" to the Robot. The agreement *145 contemplated the possibility that Flow would patent, make and sell the Robot, but it did not contain Flow's promise to do so. The trial court properly dismissed the promissory estoppel claim on summary judgment.

MOTION TO AMEND
¶ 24 One week after the summary judgment decision, Oliver moved to amend his complaint to add a claim for contract reformation. He appeals from the order denying this motion. We review a trial court's denial of leave to amend for abuse of discretion. Ino Ino, Inc. v. City of Bellevue, 132 Wash.2d 103, 142, 937 P.2d 154 (1997).
¶ 25 When justice requires amendment of a pleading, "leave shall be freely given". CR 15(a). Undue delay on the part of the movant in proposing the amendment constitutes grounds to deny a motion to amend only where such delay works undue hardship or prejudice upon the opposing party. Caruso v. Local, 100 Wash.2d 343, 349, 670 P.2d 240 (1983). Flow's showing of prejudice was adequate to justify denial of the motion. A new round of discovery would have been necessary.
¶ 26 Oliver suggests that the new contract reformation theory could have been decided on the existing factual record, without additional discovery. Assuming that to be true, then the motion to amend was properly denied based on the futility of the proposed amendment. Ino Ino, 132 Wash.2d at 142, 937 P.2d 154. A party to a contract is entitled to reformation of the contract based on one party's unilateral mistake only if the other party engaged in inequitable conduct. A party acts inequitably if it knowingly conceals a material fact from the other party and has a duty to disclose that knowledge to the other party. Washington Mut. Sav. Bank v. Hedreen, 125 Wash.2d 521, 526, 886 P.2d 1121 (1994). Oliver's new theory, based on Hedreen, was futile because even if Oliver was mistaken about what the contract promised him, Flow did not owe him the duty to disclose what was plainly written in the five-page contract. By providing Oliver with the Term Sheet, and giving him the chance to propose changes to that Term Sheet before finalizing the agreement, Flow fulfilled any duty of disclosure it had.
¶ 27 We conclude the trial court did not abuse its discretion in denying Oliver's request for leave to amend his compliant.
¶ 28 Affirmed.
WE CONCUR: GROSSE and BAKER JJ.