Argued and submitted July 2, 2014, affirmed September 23, 2015

AS 2014-11 5W LLC,
a limited liability company,
as successor in interest for CML-OR 5th, LLC,
a Florida limited liability company,
*Plaintiff-Respondent,*

*v.*

CAPLAN LANDLORD, LLC,
an Oregon limited liability company, et al.,
*Defendants,*

*and*

Bruce A. WOOD
and Glenn J. Smith,
*Defendants-Appellants.*

Multnomah County Circuit Court
100710613; A153754

359 P3d 1225

Donald J. Koehler, II, argued the cause for appellants. With him on the briefs were Laura J. Walker and Cable Huston Benedict Haagensen & Lloyd LLP.

Robyn Ridler Aoyagi argued the cause for respondent. With her on the brief were Anna K. Sortun and Tonkon Torp LLP.

Before Duncan, Presiding Judge, and Nakamoto, Judge, and Lagesen, Judge.*

NAKAMOTO, J.

---

* Nakamoto, J., *vice* Wollheim, S. J.

**NAKAMOTO, J.**

Defendants Bruce Wood and Glenn Smith each executed a guaranty agreement in connection with a $6.9 million loan for a commercial real estate project. After the borrower's successor, Caplan Landlord, LLC, defaulted on that loan, defendants failed to pay the debt under their guaranties. Plaintiff CML-OR 5th, LLC,[1] a Florida limited liability company and the assignee of the underlying promissory note and guaranties, then initiated this action. Plaintiff asserted, among other things, a claim against defendants for breach of the guaranty agreements. In response, defendants alleged that the guaranty agreements were unenforceable because the loan agreement included long-term financing that the borrower needed to pay off the initial loan, and, after the lender bank failed, that financing never materialized. Their affirmative defenses to liability under the guaranty agreements included failure to perform conditions precedent, breach of contract, and breach of the implied duty of good faith and fair dealing. Defendants also alleged that any obligation that they had to plaintiff should be reduced because some of Caplan's debt was discharged in bankruptcy.

The trial court granted plaintiff's motion for summary judgment on its claim for breach of the guaranty agreements, concluding that defendants' affirmative defenses failed as a matter of law because the guaranties were unconditional and defendants had waived the defenses in their agreements. On appeal, defendants assign error to that ruling, arguing that they were entitled to a trial because of disputed material issues of fact. Alternatively, they assign error to the amount of the judgment, which included the entire principal balance of the loan. We conclude that there is no genuine issue as to any material fact and that defendants were obligated to pay the debt in accordance with the guaranty agreements. Because plaintiff was entitled to prevail as a matter of law, we affirm the judgment.

---

[1] During the pendency of this appeal, plaintiff sold the promissory note underlying this litigation to AS 2014-11 5W LLC, thereby transferring all of plaintiff's rights, title, and interest in the promissory note to AS 2014-11. Thereafter, we granted plaintiff's motion to substitute AS 2014-11 as the plaintiff-respondent in this case. We refer to CML-OR and AS 2014-11 collectively as "plaintiff" in this opinion.

## I.  FACTS

When reviewing a trial court's grant of summary judgment, we view the evidence and all reasonable inferences that may be drawn from the evidence in the light most favorable to the nonmoving party, *Jones v. General Motors Corp.*, 325 Or 404, 408, 939 P2d 608 (1997), in this case, defendants. When viewed in the light most favorable to defendants, the record establishes the following facts.

### A.  *The Loan*

In August 2007, the Bank of Clark County agreed to loan Fifth & Washington, LLC (Fifth) $6,960,000 pursuant to a line of credit for the purchase and remodel of the Caplan Building in downtown Portland. Fifth executed a promissory note in the same amount and delivered it to the bank. As security, Fifth also executed and delivered a line of credit deed of trust and an assignment of rents to the bank.

As part of the loan agreement, the bank negotiated permanent financing with Fifth, which Fifth planned to use to pay off the $6,960,000 debt for the acquisition and construction loan. Taylor was a vice president and loan officer at the bank at the time of the transaction and negotiated the loan agreement. He testified in a declaration that the "availability of permanent financing was part of the loan package [he] negotiated with [Fifth]" and that the bank "would not have made any loan to [Fifth] without a commitment for permanent financing." He further stated that it "was the intention of the [b]ank, [b]orrower, and [g]uarantors that the permanent financing be part of the [loan agreement]" and that the bank "had the obligation to make the permanent financing available to pay off the acquisition and construction loan, as long as the conditions of permanent financing were met." Taylor further explained that, "[i]f the conditions of permanent financing were met by the [b]orrower, then the [b]ank would be under an obligation to make the financing available. Failure to make the permanent financing available if the conditions were met would constitute breach or repudiation by the [b]ank of the loan agreement."

According to Taylor, the terms of the permanent financing that the bank would provide were set forth in a "PROPOSED PERMANENT FINANCING" document, or

term sheet, attached to his declaration. That term sheet—unsigned and undated—provides, in relevant part:

"Bank of Clark County is pleased to offer permanent financing for the Caplan Building property located at the corner of Fifth and Washington in Portland, Oregon. ***
The financing will be offered on the following terms, contingent upon certain conditions:

| | |
|---|---|
| **"Borrower:** | Fifth and Washington, LLC |
| **"Amount:** | $6,960,000 (not to exceed 80% of the appraised (stabilized) value) |
| **"Interest Rate:** | *5 year FHLB + 2.50 (est. 6.90% as of 8/25/08) *actual rate to be set at closing |
| **"Repayment/Maturity:** | 30 year amortization; 5.5 year maturity |
| **"Collateral:** | First lien position (Deed of Trust) on subject property; Assignment of Rents; Subordination, Non-Disturbance and Attornment Agreement and Estoppel Certificates for all existing tenants in the subject building; Assignment of Tax Credit Proceeds (with NTCIC acknowledgment). |
| **"Guarantors:** | Bruce and Angela Wood, Glenn Smith, jointly and severably |
| **"Financial Reporting:** | Semi-annual operating (income/expense) statements for the subject building; annual financing statements and tax returns for Fifth and Washington, LLC; annual personal financial statements and tax returns for the guarantors (Bruce/Angela Wood and Glenn Smith). |
| **"Financial Covenants:** | Property must maintain a minimum debt service coverage ratio of 1.20. |

| | |
|---|---|
| **"Contingent Items:** | Construction loan to be converted to this 'mini perm' loan upon completion of the tenant improvements and occupancy of the premises by the tenants; Certificate of Occupancy issued by the City of Portland, full lien release by R&H Construction and evidence that there are no other liens against the property; real property taxes must be paid 'current' at the time of the permanent loan. |
| **"Closing Date:** | Existing construction loan to be extended six months; permanent loan anticipated to close March, 2009. |

"This term sheet outlines the general parameters under which permanent financing will be granted. Bank of Clark County currently has an interim construction loan in place with Fifth and Washington, LLC in the amount of $6,960,000. Provided there are no material changes to the subject property, or financial condition of the borrower/guarantors, Bank of Clark County is committed to provide funding for this transaction."

(Boldface in original.) Taylor did not testify that the bank and Fifth had signed that term sheet.

Although Taylor was silent on the matter of signatures, defendant Wood was not. Wood was the principal of Fifth. According to Wood, on August 28, 2007, he and the bank signed an agreement in which the bank committed to provide permanent financing to Fifth as part of the loan transaction. Wood further testified that the only copy that he had of the 2007 permanent financing commitment agreement was unsigned, and he identified the unsigned term sheet attached to the Taylor declaration as the 2007 permanent financing agreement.[2]

---

[2] Plaintiff argues that defendants' position—and, by implication, Wood's testimony—concerning the existence of a signed commitment to provide permanent financing in August 2007 is facially implausible in light of the wording of the unsigned term sheet. Plaintiff points out, for example, that the document refers to a loan "currently" in place and provides for the "[e]xisting loan" to be "extended

A year later, several changes occurred. In September 2008, the bank extended the maturity date on Fifth's credit line to March 15, 2009. The bank also increased the line of credit to $8,160,000. Contemporaneously, Fifth transferred ownership of the real property securing the loan to Caplan, and Caplan assumed Fifth's obligations under the note, trust deed, and assignment of rents. Also at that time, on September 26, 2008, Caplan and the bank signed a term sheet entitled "PERMANENT FINANCING," in which the bank offered Caplan permanent financing on certain terms and "contingent upon certain conditions."

The signed 2008 term sheet was identical to the 2007 term sheet except for five items: (1) the 2008 term sheet's title did not include the "PROPOSED" preface that was in the 2007 term sheet; (2) the borrower was Caplan rather than Fifth; (3) the collateral required did not include assignment of tax credit proceeds, as in the 2007 term sheet; (4) the list of contingent items was longer in the 2008 term sheet; and (5) the final paragraph describing the bank's commitment referred to the fact that Fifth had assigned the construction loan to Caplan.[3] The 2008 term sheet repeated

---

six months"—an extension that would not have been necessary at the inception of the loan because the original loan documents would have reflected the actual maturity date of the loan. The unsigned document also provides an estimate of the interest rate as of August 25, 2008, and not a date in 2007. Plaintiff argues that the unsigned term sheet was drafted well after the original loan closed. However, given that defendants appeal the trial court's grant of summary judgment, we view the evidence in the light most favorable to them.

[3] The amended provisions in the body of the 2008 term sheet provide:

"**Borrower:** Caplan Landlord, LLC.

"* * * * *

"**Contingent Items:** Construction loan to be converted to this 'mini-perm' loan upon completion of the improvements and occupancy of the premises by the tenants; Certificate of Occupancy issued by the City of Portland, full lien release by R&H Construction and evidence that there are no other liens against the property; real property taxes must be paid 'current' at the time of the permanent loan. The lender approves the existing leases executed * * * to date; the remaining unexecuted leases * * *, attached as Exhibit A, have been reviewed and approved, subject to final signature.

"* * * * *

that the existing construction loan was extended six months and that the "permanent loan [was] anticipated to close March, 2009."

## B. *Bank Failure, Receivership, and Default*

In January 2009—approximately three months before the permanent loan was set to close—the bank failed. The Federal Deposit Insurance Corporation (FDIC) was appointed as the receiver. The FDIC issued a notice of receivership on January 16, 2009, requesting that any claims be filed by April 23, 2009.

On March 15, 2009, the note came due. Caplan defaulted on the note. Lederman, an asset manager for the entity managing the loan, testified that Caplan had failed to pay the balance due as well as failed to pay taxes on the real property securing the note. At the time of default, the principal balance due on the note was $8,116,173.50, which reflected the bank's disbursement of the entire original loan amount of $6,960,000.00 and almost all—$1,156,173.50—of the additional $1,200,000.00 allowed by the September 2008 credit line increase.

There was no evidence that Caplan paid the loan balance down to $6.96 million. And, three months after the acquisition and construction loan matured, the contractor on the project, R&H Construction Co., filed a construction lien for more than $355,000.

It is undisputed that the FDIC, in its capacity as receiver for the bank, never provided permanent financing to Caplan. Rather, in February 2010, it sold the note and assigned the defaulted loan to MultiBank 2009-1 CML-ADC Venture, LLC, a Delaware limited liability company. MultiBank obtained all rights against borrowers and obligors related to the loan and assumed obligations to perform

---

"This term sheet outlines the general parameters under which permanent financing will be granted. [The bank] currently has an interim construction loan in place with [Fifth], which has been assigned to [Caplan], and which assignment has been consented to by [the bank], in the amount of $6,960,000. Provided there are no material changes to the subject property, or financial condition of the borrower/guarantors, [the bank] is committed to provide funding for this transaction."

(Boldface in original.)

under the loan documents as of December 2009. However, MultiBank did not assume monetary claims for breach of contract or any misconduct or violation of law by the FDIC or the bank before December 2009. MultiBank then transferred the loan to plaintiff, its affiliate.

## C. *The Guaranty Agreements*

In connection with the acquisition and construction loan and Fifth's execution of the note and other instruments, defendants Wood and Smith signed identical commercial guaranty agreements in their personal capacities. Wood's wife, Angela Wood, who is not a party on appeal, also signed a guaranty agreement. The provisions of the guaranty agreements were central to the trial court's summary judgment ruling.

Through their personal guaranties, defendants agreed to "absolutely and unconditionally guarantee[]" full payment and satisfaction of Fifth's (the "Borrower" in the guaranties) or Fifth's assignee's current and future obligations to the bank (the "Lender" in the guaranties). In that respect, the terms of the guaranty agreements that defendants signed provided for defendants' continuing guarantee of payment:

> "**CONTINUING GUARANTEE OF PAYMENT AND PERFORMANCE**. For good and valuable consideration, Guarantor absolutely and unconditionally guarantees full and punctual payment and satisfaction of the Indebtedness of Borrower to Lender, and the performance and discharge of all Borrower's obligations under the Note and the Related Documents. This is a guaranty of payment and performance and not of collection, so Lender can enforce this Guaranty against Guarantor even when Lender has not exhausted Lender's remedies against anyone else obligated to pay the Indebtedness or against any collateral securing the Indebtedness, this Guaranty or any other guaranty of the Indebtedness. * * * Under this Guaranty, Guarantor's liability is unlimited and Guarantor's obligations are continuing.

> "* * * * *

> "**CONTINUING GUARANTY**. THIS IS A 'CONTINUING GUARANTY' UNDER WHICH GUARANTOR AGREES TO GUARANTEE THE FULL AND PUNCTUAL

PAYMENT, PERFORMANCE AND SATISFACTION OF THE INDEBTEDNESS OF BORROWER TO LENDER, NOW EXISTING OR HEREAFTER ARISING OR ACQUIRED, ON AN OPEN AND CONTINUOUS BASIS. ACCORDINGLY, ANY PAYMENTS MADE ON THE INDEBTEDNESS WILL NOT DISCHARGE OR DIMINISH GUARANTOR'S OBLIGATIONS AND LIABILITY UNDER THIS GUARANTY FOR ANY REMAINING AND SUCCEEDING INDEBTEDNESS EVEN WHEN ALL OR PART OF THE OUTSTANDING INDEBTEDNESS MAY BE A ZERO BALANCE FROM TIME TO TIME."

(Boldface and uppercase in original.)

Defendants and the bank agreed that the guaranties would endure so long as Fifth or its successors owed or would owe the bank money based on loans that the bank would make to Fifth:

"**DURATION OF GUARANTY**. This Guaranty will take effect when received by Lender without the necessity of any acceptance by Lender, or any notice to Guarantor or to Borrower, and will continue in full force until all the Indebtedness incurred or contracted before receipt by Lender of any notice of revocation shall have been fully and finally paid and satisfied and all of Guarantor's other obligations under this Guaranty shall have been performed in full. \*\*\* It is anticipated that fluctuations may occur in the aggregate amount of the Indebtedness covered by this Guaranty, and Guarantor specifically acknowledges and agrees that reductions in the amount of the Indebtedness, even to zero dollars ($0.00), shall not constitute a termination of this Guaranty. This Guaranty is binding upon Guarantor and Guarantor's heirs, successors and assigns so long as any of the Indebtedness remains unpaid and even though the Indebtedness may from time to time be zero dollars ($0.00)."

(Boldface in original.) "Indebtedness" was broadly defined in the guaranty agreements and included debts, liabilities, and obligations that were "unenforceable against Borrower for any reason whatsoever":

"**INDEBTEDNESS.** The word 'Indebtedness' as used in this Guaranty means all of the principal amount outstanding from time to time and at any one or more times, accrued

unpaid interest thereon and all collection costs and legal expenses related thereto permitted by law, attorneys' fees, arising from any and all debts, liabilities and obligations of every nature or form, now existing or hereafter arising or acquired, that Borrower individually or collectively or interchangeably with others, owes or will owe Lender. 'Indebtedness' includes, without limitation, loans, advances, debts, \* \* \* other obligations, and liabilities of Borrower, and any present or future judgments against Borrower, future advances, loans or transactions that renew, extend, modify, refinance, consolidate or substitute these debts, liabilities and obligations whether: voluntarily or involuntarily incurred; due or to become due by their terms or acceleration; absolute or contingent; liquidated or unliquidated; determined or undetermined; direct or indirect; primary or secondary in nature or arising from a guaranty or surety; secured or unsecured; joint or several or joint and several; evidenced by a negotiable or non-negotiable instrument or writing; originated by Lender or another or others; barred or unenforceable against Borrower for any reason whatsoever; for any transactions that may be voidable for any reason (such as infancy, insanity, ultra vires or otherwise); and originated then reduced or extinguished and then afterwards increased or reinstated."

(Boldface in original.) Defendants further acknowledged, through representations and warranties to the bank, that "no representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of this Guaranty[.]" Nothing in the provisions above suggested that defendants would be relieved of their obligations under the guaranty agreements in the event that the bank failed to provide permanent financing for the project.

Defendants also broadly agreed to waive numerous rights, potential demands that they might make of the bank, and defenses to payment:

"**GUARANTOR'S WAIVERS**. Except as prohibited by applicable law, Guarantor waives any right to require Lender (A) to continue lending money or to extend other credit to Borrower; \* \* \* or (F) to commit any act or omission of any kind, or at any time, with respect to any matter whatsoever.

"Guarantor also waives any and all rights or defenses based on suretyship or impairment of collateral including, but not limited to, any rights or defenses arising by reason of * * * (C) any disability or other defense of Borrower, of any other guarantor, or of any other person, or by reason of the cessation of Borrower's liability from any cause whatsoever, other than payment in full in legal tender of the Indebtedness; * * * or (F) any defenses given to guarantors at law or in equity other than actual payment and performance of the Indebtedness. If payment is made by Borrower, whether voluntarily or otherwise, or by any third party, on the Indebtedness and thereafter Lender is forced to remit the amount of that payment to Borrower's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, the Indebtedness shall be considered unpaid for the purpose of the enforcement of this Guaranty.

"Guarantor further waives and agrees not to assert or claim at any time any deductions to the amount guaranteed under this Guaranty for any claim of setoff, counterclaim, counter demand, recoupment or similar right, whether such claim, demand or right may be asserted by the Borrower, the Guarantor, or both."

(Boldface in original.)

Concurrently with their agreement to the waivers, defendants expressed that they knew the significance of those waivers:

**"GUARANTOR'S UNDERSTANDING WITH RESPECT TO WAIVERS**. Guarantor warrants and agrees that each of the waivers set forth above is made with Guarantor's full knowledge of its significance and consequences and that, under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any such waiver is determined to be contrary to any applicable law or public policy, such waiver shall be effective only to the extent permitted by law or public policy."

(Boldface in original.) And, defendants acknowledged that they had read and understood the terms of the guaranty agreement, that they had had the opportunity to be advised by an attorney regarding the agreement's terms, and that the guaranty agreements "fully reflect[ed] [their] intentions":

"**Integration**. Guarantor further agrees that Guarantor has read and fully understands the terms of this Guaranty; Guarantor has had the opportunity to be advised by Guarantor's attorney with respect to this Guaranty; the Guaranty fully reflects Guarantor's intentions and parol evidence is not required to interpret the terms of this Guaranty. Guarantor hereby indemnifies and holds Lender harmless from all losses, claims, damages, and costs (including Lender's attorneys' fees) suffered or incurred by Lender as a result of any breach by Guarantor of the warranties, representations and agreements of this paragraph."

(Boldface in original.)

Defendants and the bank also agreed to a number of miscellaneous provisions, two of which are relevant to this appeal. In one, the parties chose federal and Washington law to govern the guaranties:

"**Governing Law**. This Guaranty will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Washington without regard to its conflicts of law provisions."

(Boldface in original.) In the other, an integration clause, the parties agreed on the scope of the guaranty:

"**Amendments**. This Guaranty, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Guaranty. No alteration of or amendment to this Guaranty shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment."

(Boldface in original.) The term "Related Documents" was defined in the guaranty agreements as including all "loan agreements * * * executed in connection with the Indebtedness" of Fifth and its successors:

"**Related Documents**. The words 'Related Documents' mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness."

(Boldface in original.) In defendants' view, the 2007 perma-
nent financing term sheet was a "Related Document" exe-
cuted in connection with the construction loan.

## D. *Actions to Enforce the Loan Agreement and Guaranties*

In 2010, the parties sued each other in separate
forums. In July, plaintiff initiated this action against Fifth,
Caplan, defendants, Angela Wood, and others. In October,
defendants sued plaintiff, the FDIC, and others in the
Oregon federal district court, alleging breach of contract by
the bank and the FDIC, as the bank's receiver, and miscon-
duct by the FDIC.

In early 2011, the district court granted the FDIC's
motion to dismiss for lack of subject matter jurisdiction.
The district court concluded that it lacked jurisdiction
because defendants had not yet exhausted their adminis-
trative remedies against the FDIC, as required by 12 USC
§ 1821(d)(13)(D) of the Financial Institutions Reform, Recov-
ery, and Enforcement Act of 1989 (FIRREA).[4]

Soon after plaintiff filed this action, in August
2010, Caplan filed for bankruptcy. The bankruptcy stayed
the proceeding, and plaintiff subsequently moved to sever
the claims against Caplan. The trial court granted plain-
tiff's motion to sever and to reinstate its claims for breach
of guaranty against the three guarantors (defendants and
Wood's wife).

Plaintiff then moved for summary judgment on its
claims for breach of the guaranties. Plaintiff argued that
no genuine issue of material fact existed with respect to
(1) the validity of the note and guaranties; (2) Caplan's

---

[4] Section 1821(d)(13)(D) of FIRREA provides:

"Limitation on judicial review

"Except as otherwise provided in this subsection, no court shall have
jurisdiction over—

"(i) any claim or action for payment from, or any action seeking a deter-
mination of rights with respect to, the assets of any depository institution for
which the Corporation has been appointed receiver, including assets which
the Corporation may acquire from itself as such receiver; or

"(ii) any claim relating to any act or omission of such institution or the
Corporation as receiver."

default and delinquency on the note; (3) defendants' breach of the guaranties; and (4) the amount due and owing on the note. Plaintiff contended that, therefore, it was entitled to judgment as a matter of law against the three guarantors. At a hearing on the motion, the court continued the summary judgment proceeding to allow the three guarantors to file an amended answer.

In their amended answer, the guarantors supplemented and added defenses. Four of those defenses are relevant to this appeal. For their breach of contract defense, they alleged that, after being appointed as receiver, the FDIC had refused to disburse to Caplan the remaining amount on the line of credit, which it needed to complete remodeling of the building, and that the FDIC and its assignees had refused to provide the permanent financing that the bank had promised. They contended that, as a result of those alleged breaches of the loan agreement, plaintiff could not enforce the guaranty agreements. For their defense predicated on a failure of conditions precedent, defendants alleged that full funding of the loan and the provision of permanent financing were conditions precedent to their liability as guarantors. Defendants also asserted a defense based on a breach of the implied duty of good faith and fair dealing. They alleged that the FDIC breached the implied duty because the FDIC knew that Fifth, Caplan, and defendants would not be able to comply with their contractual obligations absent full funding of the acquisition and construction loan and the provision of permanent financing. Finally, defendants alleged that they were entitled to a declaration that any indebtedness that they guaranteed is limited to the modified schedule of payments set forth in Caplan's bankruptcy plan of reorganization.[5]

E.  *Summary Judgment Ruling*

After a second summary judgment hearing, the trial court ruled that summary judgment was appropriate against defendants, but that it would not grant it as to the third guarantor, Angela Wood, who had raised a

---

[5] Plaintiff moved to strike defendants' new affirmative defenses; the trial court denied that motion.

defense under a federal statute not applicable to defendants. The court was not persuaded that defendants' affirmative defenses required a trial.

First, the court considered and rejected defendants' argument that the FDIC had failed to perform conditions precedent when it failed to fully fund the construction loan and failed to provide permanent financing for the project; that a jury should decide whether the FDIC or plaintiff had thereby repudiated the loan agreement; and that, if the jury so found, then plaintiff would be barred from enforcing the guaranties. As to that argument, the court concluded that, although it believed that the parties' expectation had been that the bank would provide permanent financing to Fifth or Caplan at the end of the acquisition and construction loan period, that expectation did not alter defendants' obligations under the terms of the guaranty agreements. The court explained:

> "I read the terms of the note and I read the guaranties. And * * * one of the features of this case is that the guaranties that were given were unconditional, absolute, unqualified; and, in fact, had numerous places in there where the guarantors waived defenses, waived the right to assert claims and defenses; affirmatively represented there were no agreements that were not express therein and so forth and so on.
>
> "And neither the note nor the guaranties make any cross-reference to this obligation to provide permanent financing. It's * * * not mentioned anywhere in those documents."

The court was not swayed by defendants' testimony regarding their intent in signing the guaranties, which it viewed as parol evidence "that varies or contradicts the terms of [the] signed writing." The court added that it was uncertain that the 2007 and 2008 term sheets could have been enforced in any event.

The court also ruled that defendants' affirmative defenses failed as a matter of law for two other reasons. The court noted that it lacked jurisdiction over defendants' defense to payment under 12 USC § 1821(d)(13)(D) of FIRREA because defendants had not exhausted their

administrative remedies against the FDIC. And, the court concluded, plaintiff was, in effect, a holder in due course and took the promissory note free of any defenses that defendants may have had against the bank or the FDIC as its receiver.

Defendants' counsel then argued that, under the terms of the guaranty, the guarantors were liable only for the amount that Caplan would have to repay based on the partial discharge of its obligation in its bankruptcy proceeding. The trial court, however, rejected that argument. In part, the court relied on the unconditional promise to pay in the guaranties. The court refused to reduce plaintiff's monetary award also because the guaranty was designed to allow the bank to collect the entire amount of the debt, regardless of the borrower's bankruptcy.

The court entered an order granting plaintiff summary judgment on its claim for breach of the guaranty agreements against defendants. The court entered a limited judgment and money award against defendants in the amount of $8,116,173.50, plus pre-judgment interest in the amount of $2,587,199.39.[6] Defendants appeal, asserting one assignment of error: "Defendants assign as error the trial court's granting of Plaintiff's Motion for Summary Judgment, and in the alternative the amount of the judgment awarded."

## II. DISCUSSION

### A. *Choice of Law*

Before turning to the merits of the appeal, we address the parties' choice of Washington law to govern the guaranty agreements. The parties do not directly argue about whether the choice of law provision should be given effect, but their contrary citations to Oregon and Washington case law indicate some disagreement.

In their opening brief, defendants make no reference to the choice of law provision in the guaranty agreements and cite Oregon cases governing contract interpretation. Plaintiff, however, notes the choice of law provision and

---

[6] Plaintiff tried its claim against Angela Wood. After she prevailed and plaintiff filed a notice of appeal, those parties settled.

cites Washington cases concerning contract interpretation. It appears that the parties acted in the same manner below, with defendants relying on Oregon case law while plaintiff cited Washington cases, or both Washington and Oregon cases.

Because the disputed issues involve general rules of contract law that do not implicate either state's fundamental policy, and because neither Oregon nor Washington has a materially greater interest than the other in the disputed issues, we will give effect to the parties' contractual choice of law and apply Washington law to this case. *See M+W Zander v. Scott Co. of California*, 190 Or App 268, 272, 78 P3d 118 (2003) (citing section 187(2) of the *Restatement (Second) of Conflict of Laws* (1971) for the considerations made in determining whether to give effect to a choice of law provision).

B. *Summary Judgment for Plaintiff on Its Claim for Breach of Guaranty*

Defendants' primary challenge is to the trial court's decision to grant plaintiff's summary judgment motion. Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. ORCP 47 C. There is "[n]o genuine issue of material fact * * * if, based upon the record before the court viewed in a manner most favorable to the [nonmoving] party, no objectively reasonable juror could return a verdict for the [nonmoving] party on the matter that is the subject of the motion for summary judgment." *Id.* Even with that view of the evidence, we conclude that the trial court properly granted plaintiff's motion.

1. *Summary judgment record*

One of defendants' arguments concerns the admissibility of some of plaintiff's evidence in the summary judgment record. Defendant argues that the trial court should not have considered the affidavits and exhibits of Lederman, plaintiff's asset manager, in making the summary judgment determination. As an initial matter, we decline to consider that argument, because it is not properly before us.

Below, defendants moved to strike Lederman's affidavits, including attached exhibits; the trial court denied

those motions. On appeal, however, defendants do not assign error to the trial court's rulings denying their motion to strike. Under ORAP 5.45, each "assignment of error should identify one—and only one—ruling that is being challenged." *Taylor v. Ramsay-Gerding Construction Co.*, 233 Or App 272, 288 n 8, 226 P3d 45, *adh'd to as modified on recons*, 235 Or App 524, 234 P3d 129 (2010); ORAP 5.45(2) ("Each assignment of error shall be separately stated under a numbered heading."); ORAP 5.45(3) ("Each assignment of error shall identify precisely the legal, procedural, factual, or other ruling that is being challenged."). Here, defendants assign error to the trial court's order granting summary judgment to plaintiff, and, under that assignment, they make an argument regarding Lederman's affidavits and exhibits. The trial court's ruling on plaintiff's motion for summary judgment and its rulings on defendants' motion to strike Lederman's affidavits and exhibits are separate rulings that involve different legal issues; therefore, we decline to reach the evidentiary argument. *See Strawn v. Farmers Ins. Co.*, 228 Or App 454, 475, 209 P3d 357 (2009), *aff'd in part and rev'd in part on other grounds*, 350 Or 336, 258 P3d 1199, *adh'd to on recons*, 350 Or 521, 256 P3d 100 (2011), *cert den*, ___ US ___ (2012) (in a case in which an assignment of error addressed multiple rulings involving different legal issues and different preservation concerns, the court declined to reach certain issues raised in the assignment of error).

2. *Defense based on permanent financing as a condition precedent*

We next consider and reject defendants' contention that their "condition precedent" defense required a trial. Defendants contend that the trial court erred in granting summary judgment because a jury should determine whether the bank or one of its successor's provision of permanent financing was a condition precedent to their performance under the guaranties. Defendants, however, raise a legal question, not a fact question, as to whether the guaranty agreements unambiguously do not contain such a condition precedent.

"Interpreting a contract provision is a question of law only when (1) the interpretation does not depend on the use of extrinsic evidence, or (2) only one reasonable inference can

be drawn from the extrinsic evidence." *Lokan & Associates, Inc. v. ABP*, 177 Wash App 490, 499, 311 P3d 1285, 1289 (2013) (internal quotation marks omitted). "Thus, summary judgment is appropriate only when the parties' written contract, viewed in light of the parties' other objective manifestations, has only one reasonable meaning." *Id.* at 499, 311 P3d at 1289 (internal quotation marks omitted). That is the case here, despite defendants' argument to the contrary.

In support of their argument, defendants rely on the provision in each guaranty agreement that describes its scope as the "Guaranty, together with any Related Documents." Defendants also rely on the definition of "Related Documents" in the guaranty agreements, which refers to "all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness."

Defendants assert that the meaning and effect of those provisions are ambiguous and should be decided by a jury. To arrive at that result, defendants first contend that the guaranty agreements "should be interpreted in such a manner as to give effect to all the terms of the parties' understanding and agreement as reflected in the Related Documents, including the two permanent financing commitments." In their view, because the guaranty agreement includes the permanent financing commitments, it is reasonable to view the enforceability of the guaranties as "subject to all the understandings and agreements of the parties under the Related Documents." Next, although defendants do not and cannot point to any part of the guaranty agreements stating a condition precedent, they argue that, "[u]nder the circumstances in which the Guaranties were signed, it is evident that the parties involved intended the Guaranty to be conditioned on the full funding of the construction loan and the funding of the permanent financing." Finally, they note that they presented unrefuted evidence regarding the parties' intent on that matter. Thus, in their view, those facts, "at minimum, establish a genuine issue of material fact for a jury to decide as to the meaning and effect of the reference to and inclusion of the Related Documents in the terms of the Guaranties."

Washington law does not support defendants. Under Washington law, a guaranty "is a promise to answer for the debt, default, or miscarriage of another person." *Sauter ex rel. Sauter v. Houston Cas. Co.*, 168 Wash App 348, 356, 276 P3d 358, 362 (2012) (internal quotation marks omitted). "In the absence of fraud, if a guarantor unconditionally promises payment or performance of the principal contract, the guaranty is deemed absolute, unless by its terms a condition precedent to liability of the guarantor is created." *National Bank of Washington v. Equity Investors*, 81 Wash 2d 886, 917, 506 P2d 20, 39 (1973).

Conditions precedent "are those facts and events, occurring subsequently to the making of a valid contract, that must exist or occur before there is a right to immediate performance, before there is a breach of contract duty, [and] before the usual judicial remedies are available." *Ross v. Harding*, 64 Wash 2d 231, 236, 391 P2d 526, 530 (1964). "Whether a provision in a contract is a condition, the non-fulfillment of which excuses performance, depends upon the intent of the parties, to be ascertained from a fair and reasonable construction of the language used in the light of all the surrounding circumstances." *Id.* at 236, 391 P2d at 531. "Any words which express, when properly interpreted, the idea that performance of a promise is dependent on some other event will create a condition." *Id.* at 237, 391 P2d at 531. "Phrases and words such as 'on condition,' 'provided that,' 'so that,' 'when,' 'while,' 'after,' or 'as soon as' are often used." *Id.* at 237, 391 P2d at 531.

The Washington Supreme Court has described the distinction between an absolute and conditional guaranty this way:

"The contract of guaranty may be absolute or it may be conditional. An absolute guaranty is an unconditional undertaking on the part of the guarantor that the debtor will pay the debt or perform the obligation. A conditional guaranty contemplates, as a condition to liability on the part of the guarantor, the happening of some contingent event other than the default of the principal debtor or the performance of some act on the part of the obligee. Where the guaranty is conditional, the obligation of the guaranty

may not be enforced unless the event has occurred or the act has been performed."

*National Bank of Washington*, 81 Wash 2d at 917-18, 506 P2d at 39 (internal quotation marks omitted). "A guaranty of the payment of an obligation, without *words of limitation or condition*, is construed as an absolute or unconditional guaranty." *Id.* at 918, 506 P2d at 39 (emphasis added).

The problem with defendants' argument is that the guaranty agreements are unconditional and disclaim that they contain any condition to liability. The terms of the guaranties are susceptible to one reasonable meaning: the guarantor's obligation to pay Caplan's indebtedness to plaintiff is absolute and not conditioned on the provision of permanent financing. The guaranties provide that defendants "absolutely and unconditionally guarantee[] full and punctual payment and satisfaction of the Indebtedness * * *." The guaranties also provide that they are effective

"when received by Lender without the necessity of any acceptance by Lender, or any notice to Guarantor or to Borrower, and will continue in full force until all the Indebtedness incurred or contracted before receipt by Lender of any notice of revocation shall have been fully and finally paid and satisfied and all of Guarantor's other obligations under this Guaranty shall have been performed in full."

Even accepting that the guaranty agreements included the 2007 term sheet outlining permanent financing, defendants cannot point to any part of the guaranty agreements indicating that the bank's or the FDIC's performance of promises that the bank made in the 2007 term sheet was a condition precedent under Washington law. The provisions of both the guaranty agreements and the permanent financing term sheets lack any words expressing that defendants' promises to pay the indebtedness in the guaranties were conditioned on the provision of permanent financing. The mere fact that the guaranty agreements, by their terms, include the permanent financing commitments does not make those promises conditioned on the bank's or its predecessor's provision of permanent financing. *See National Bank of Washington*, 81 Wash 2d at 919, 506 P2d at 40 (stating that courts must enforce a guaranty according to its terms, "without reading into it terms and conditions

on which it is completely silent"). Indeed, defendants are merely describing performance required by the obligee, in this case the bank or the FDIC, not a condition precedent. *See id.* at 917, 506 P2d at 39 (distinguishing between absolute and conditional guaranties).

The extrinsic evidence of the parties' intent, upon which defendants also rely, does not help their case. "To prove the intent of contracting parties, a party may offer extrinsic evidence of the context surrounding an instrument's execution." *Oliver v. Flow Intern. Corp.*, 137 Wash App 655, 660, 155 P3d 140, 143 (2006) (citing *Berg v. Hudesman*, 115 Wash 2d 657, 667, 801 P2d 222, 229 (1990)). "But extrinsic evidence is relevant only to determine the meaning of specific words and terms used, not to show an intention independent of the instrument or to vary, contradict or modify the written word." *Id.* at 660, 155 P3d at 143; *see also J.W. Seavey Hop Corporation v. Pollock*, 20 Wash 2d 337, 349, 147 P2d 310, 316 (1944) (explaining that parol evidence "is admitted for the purpose of aiding in the interpretation of what is in the instrument, and not for the purpose of showing intention independent of the instrument" and that "[i]t is the duty of the court to declare the meaning of what is written, and not what was intended to be written"). Defendants' use of extrinsic evidence does exactly what is prohibited under Washington law, by directly contradicting the terms of the guaranty agreements.

Thus, contrary to defendants' contention, the guaranties unambiguously provide that defendants unconditionally promised to stand for Caplan's indebtedness to plaintiff. Therefore, there is no issue of material fact for trial on defendants' affirmative defense of failure of a condition precedent. Hence, the trial court did not err in concluding that plaintiff was entitled to prevail as a matter of law on that defense.

3. *Defenses based on breach of express contract terms and breach of the implied duty of good faith and fair dealing*

Defendants also contend that the court erred in granting summary judgment because there were genuine issues of material fact as to their affirmative defenses of breach of contract and breach of the implied duty of good

faith and fair dealing. However, as noted above, the guaranties contained broad waivers. Defendants appear to argue that, because plaintiff could not establish a condition precedent to their liability under the guaranty agreements, the waivers of defenses were inapplicable. We have rejected defendants' defense premised on a condition precedent in the guaranty agreements, and, as explained below, defendants do not challenge the waivers of defenses on any other basis. Accordingly, we conclude that there was no issue of material fact for trial and that plaintiff was entitled to judgment as a matter of law with respect to defendants' affirmative defenses based on breach of express and implied contract.

Defendants waived "any right to require Lender * * * to continue lending money or to extend other credit to Borrower[.]" Defendants further waived "any and all rights or defenses based on suretyship or impairment of collateral," including, but not limited to, "any rights or defenses by reason of" any "defense of Borrower" or "any defenses given to guarantors at law or in equity other than actual payment and performance of the Indebtedness." Defendants also warranted and agreed that each of the waivers was "made with [each defendant's] full knowledge of its significance and consequences and that, under the circumstances, the waivers are reasonable and not contrary to public policy or law."

Defendants contend that the factual dispute concerning whether the bank and defendants signed a term sheet for permanent financing in 2007 creates a material issue of fact for trial on their defenses of breach of express and implied contract terms. However, assuming that both the 2007 and 2008 term sheets for permanent financing were signed and were incorporated as part of the guaranty agreements—that is, accepting defendants' view of the facts—defendants do not explain why the trial court erred in concluding that defendants waived those defenses. First, defendants did not argue to the trial court and do not argue on appeal that a guarantor cannot validly waive defenses based on suretyship or more broadly, any defenses given to guarantors at law or in equity. Second, defendants do not argue that they never waived their asserted defenses

of breach of contract or breach of the implied duty of good faith and fair dealing or any other defense. Third, apart from their "condition precedent" argument, defendants do not argue that their broad waivers of defenses are invalid or do not apply to the defenses that they raised in this case.[7]

Instead, defendants repeatedly bring their argument concerning the summary judgment ruling back to the fulfillment of permanent financing as a condition to their guaranties. At various points in their opening brief, concerning their defenses, they assert:

- "Under the circumstances in which the Guaranties were signed, it is evident that the parties involved intended the Guaranty to be *conditioned* on the full funding of the construction loan and the funding of the permanent financing."

- "Plaintiff first has to establish that it, or its predecessors, performed all the *conditions precedent* to enforcement of the Guaranties."

- "Whether Defendants' obligations under the Guaranties were *conditioned* on Plaintiff, or Plaintiff's predecessor, funding the balance of the construction loan and/or the permanent financing, is a material issue of fact."

(Emphases added.) Again, we have rejected their "condition precedent" argument as a matter of law. Thus, as the case was litigated below, the trial court did not err in concluding that defendants waived the right to assert breach of express and implied contract terms as affirmative defenses to payment under the guaranties.

Although plaintiff offers additional reasons why defendants cannot raise those defenses, including some that stem from the FDIC's involvement as a receiver after the bank failed, we do not reach those issues. In short, the trial court did not err in granting plaintiff's motion for summary judgment.

---

[7] Defendants have offered no Washington authorities to support their position, and *National Bank of Washington* undermines their position. *See* 81 Wash 2d at 917, 506 P2d at 39 ("In the absence of fraud, if a guarantor unconditionally promises payment or performance of the principal contract, the guaranty is deemed absolute, unless by its terms a condition precedent to liability of the guarantor is created.").

## C. *Amount of the Monetary Award in the Judgment*

We turn to defendants' "alternative" assignment of error. As earlier noted, in their opening brief, defendants asserted a single assignment of error: "Defendants assign as error the trial court's granting of Plaintiff's Motion for Summary Judgment, and in the alternative the amount of the judgment awarded." Defendants thus failed to separately assign error to the trial court's refusal to reduce the amount of the judgment in accordance with ORAP 5.45(2). We nevertheless consider the assignment in view of defendants' express challenge to the ruling in an assignment of error, their objection to the form of the judgment in the trial court, and the parties' full briefing of the issue on appeal. We reject the assignment on its merits because defendants' argument—that they should enjoy a reduction of the debt because Caplan obtained the same in its bankruptcy—contradicts the terms of the guaranty agreements.

In defendants' seventh affirmative defense, they alleged that they were entitled to a reduction in the obligation under the guaranties based on Caplan's plan of reorganization in the bankruptcy court, which resulted in a partial discharge of Caplan's debt. They also sought a declaration that "any indebtedness guaranteed by Defendants is the modified schedule of payments set forth in Caplan's confirmed Plan of Reorganization." At the time of the summary judgment hearing addressing that issue, Caplan's reorganization plan had not yet been approved. However, as noted above, the trial court disagreed with defendants' contentions because they had promised to pay the loan, which was more than eight million dollars, and Caplan's bankruptcy and the legal effect of the plan of reorganization did not modify their obligation.

On appeal, defendants have shifted position. They now argue that the amount awarded in the judgment must be reduced because Caplan and defendants made payments on the loan during the bankruptcy proceedings and plaintiff has "a performing loan with regular payments" on an amended note in the amount of $6,595,000 pursuant to Caplan's Seventh Amended Plan of Reorganization. Defendants contend that the monetary award "should be

reduced by the $6,595,000, plus the amount of payments received by Plaintiff prior to and during the bankruptcy."

Even assuming that defendants' current argument is preserved, it is precluded by the terms of the guaranty agreement. The point of the guaranty was to ensure that the lender was repaid, even if the borrower became insolvent. Each guaranty provides that it is "a guaranty of payment and performance and not of collection, so Lender can enforce [the] Guaranty against Guarantor even when Lender has not exhausted Lender's remedies against anyone else obligated to pay the Indebtedness or against any collateral securing the Indebtedness[.]" Defendants also waived any defenses arising by reason of "any disability or other defense of Borrower *** or by reason of the cessation of Borrower's liability from any cause whatsoever, other than payment in full in legal tender, of the Indebtedness[.]" Those terms preclude defendants' arguments that Caplan's bankruptcy has the effect of somehow reducing their obligation under the guaranty agreements.

As for defendants' argument that the amount of the judgment must be reduced because defendants and Caplan have made payments on the loan, we agree with plaintiff that defendants may request at any time that plaintiff file a partial satisfaction of judgment to reflect amounts actually paid as of the time of the filing. *See* ORS 18.225(3) ("Upon request by a judgment debtor or any person with an interest in real property subject to a judgment lien, a judgment creditor must provide to the judgment debtor a satisfaction document for all amounts credited against a money award as of the date that the satisfaction document is signed."). Accordingly, the trial court did not err by entering a judgment for the full amount due on the note.

Affirmed.