244 P.3d 970 (2010)
Mark and Kristina GREY, individually and the marital community composed thereof, Appellants,
v.
James and Sue LEACH, individually and the marital community composed thereof, Respondents.
Nos. 63221-3-I, 63290-6-I.
Court of Appeals of Washington, Division 1.
December 13, 2010.
*971 Philip A. Talmadge, Sidney Tribe, Talmadge/Fitzpatrick, Tukwila, WA, Kim M. Johannessen, Tracey Y. Williams, Johannessen & Associates, P.S., Seattle, WA, for Appellants.
Donna Young, Lee Smart PS, Seattle, WA, for Respondents.
LEACH, A.C.J.
¶ 1 Mark and Kristina Grey, the current owners of residential property contaminated with fuel oil, brought this action against the former owners, James and Sue Leach.[1] The Greys included in their complaint claims under the Model Toxics Control Act (MTCA), chapter 70.105D RCW. We granted discretionary review of the trial court's pretrial rulings on three affirmative defenses to these claims asserted by the Leaches. We must decide whether the statutory liability exclusion for either an "innocent purchaser" (RCW 70.105D.040(3)(b)) or a "domestic purpose" (RCW 70.105D.040(3)(c)) "applies to former owners of property where heating oil was released from the residential heating system operated by them during their ownership." We must also decide whether the terms of the parties' real estate purchase and sale agreement (REPSA) bar the Greys' MTCA claims as a matter of law.
¶ 2 We hold that because the Leaches, as operators of the heating system, contributed to the contamination, they are not "innocent *972 purchasers" under MTCA and that releasing fuel oil from leaking return pipes running to an underground storage tank is not a "domestic use" under the Act. We also hold that the REPSA did not allocate MTCA liability between the parties. Accordingly, we reverse in part and affirm in part.

BACKGROUND
¶ 3 In February 2000, the Greys purchased a house, originally built in 1924, from the Leaches, who purchased it in 1966. A 720-gallon underground storage tank (UST) supplied oil to the furnace used to heat the house. This oil flowed through supply and return lines running beneath a concrete slab in the basement floor. According to the Leaches' age-dating expert, small holes in one of the return lines had leaked fuel oil since 1987 and possibly as far back as 1971. The record contains no evidence that anyone knew or had reason to know about this leak at the time of the sale.
¶ 4 In 2004, as part of an extensive remodel, the Greys decommissioned the oil tank and converted the house to natural gas heat. In 2007, they discovered that the return line had leaked over time, releasing a significant quantity of oil into the ground under and around the residence. This caused soil contamination exceeding levels for residential-unrestricted use allowed by MTCA. The Greys claim to have incurred more than $200,000 in remediation costs. In this action they seek to establish their entitlement to an equitable contribution from the Leaches under RCW 70.105D.080.
¶ 5 In a second amended answer, the Leaches raised a number of affirmative defenses, including statutory "innocent purchaser" and "domestic use" defenses and a claim that the parties' REPSA allocated clean-up liability to the Greys.[2] The Leaches also filed a counterclaim seeking a declaratory judgment that the Greys were solely responsible for remediation costs under the Act. In addition, the Leaches alleged that as a result of negligence, breach of contract, or other fault, the Greys failed to recover the full amount of pollution liability insurance and that the Leaches were entitled to a setoff for any insurance settlement paid.
¶ 6 The Greys filed a motion for partial summary judgment, seeking a determination that the Leaches were liable under MTCA and that the parties' REPSA did not bar their claims. The Leaches filed a cross motion, asking the court to dismiss the Greys' claims on the basis of the two MTCA defenses described above. The court essentially denied both motions and held that the REPSA did not bar the Greys' MTCA claims. The court denied reconsideration.
¶ 7 The Greys then asked the trial court to certify for discretionary review whether the statutory "innocent purchaser" and "domestic use" defenses were available to the Leaches. While this motion was pending, the Greys sought discretionary review of these two issues. The trial court then certified them for review. The Leaches separately sought discretionary review of three trial court orders. We granted review of the two certified issues and whether the parties' REPSA barred the Greys' MTCA claim. We denied the balance of the Leaches' motion for discretionary review and consolidated the two cases.

STANDARD OF REVIEW
¶ 8 This court reviews a summary judgment order de novo, engaging in the same inquiry as the trial court.[3] Summary judgment is proper if, after viewing all facts and reasonable inferences in the light most favorable to the nonmoving party, there are no genuine issues as to any material fact and the moving party is entitled to judgment as a matter of law.[4] The interpretation and applicability of a statute presents questions of law *973 reviewed de novo, as does the construction of an unambiguous contract.[5]

ANALYSIS

MTCA Exemptions
¶ 9 The trial court certified for discretionary review two legal issues of first impression for Washington courts. These are whether, under MTCA, either the "innocent purchaser" defense (RCW 70.105D.040(3)(b)) or the "domestic purpose" defense (RCW 70.105D.040(3)(c)) applies to former owners of a house when the residential heating system operated by them leaked oil into the ground and contaminated it during their ownership.
¶ 10 RCW 70.105D.040 generally provides that each owner and operator of a "facility" is strictly liable, jointly and separately, for all remedial action costs and for all natural resource damages resulting from the release of hazardous substances. RCW 70.105D.040(3) excludes from liability certain categories of persons, including "innocent purchasers" (RCW 70.105D.040(3)(b)) and those lawfully and without negligence using a hazardous substance for a "personal or domestic purpose" (RCW 70.105D.040(3)(c)).
¶ 11 The Leaches admit that "without their knowledge, or having reason to know,... a release of home heating oil that was used for heating their house, occurred on the property while they owned it." Home heating oil is a hazardous substance for purposes of MTCA.[6] However, the Leaches claim that MTCA excludes them from liability either as "innocent purchasers" or because they used heating oil for a "domestic purpose." We address the "innocent purchaser" exclusion first.
¶ 12 In November 1988, voters enacted the MTCA with Initiative Measure No. 97 (I-97). This initiative repealed legislation adopted earlier that year that I-97 proponents considered too lenient and too great a departure from the federal legislation after which it was patterned.[7] Rules of statutory construction apply to voter initiatives.[8] Thus, to determine the meaning of MTCA, we seek to ascertain the collective intent of the voters, who, in their legislative capacity, enacted this measure.[9] We "focus[] on the language as the average informed voter voting on the initiative would read it. Where the language of an initiative enactment is `plain, unambiguous, and well understood according to its natural and ordinary sense and meaning, the enactment is not subject to judicial interpretation.'"[10]
¶ 13 RCW 70.105D.040(3)(b) provides that an owner, past owner, or purchaser of the facility is not liable if he or she can
establish by a preponderance of the evidence that at the time the facility was acquired by the person, the person had no knowledge or reason to know that any hazardous substance, the release or threatened release of which has resulted in or contributed to the need for the remedial action, was released or disposed of on, in, or at the facility.
Three limitations apply to this exclusion. It does not apply to an owner who (1) "had actual knowledge of the release or threatened release of a hazardous substance" on the property and transferred the property without disclosing such knowledge,[11] (2) failed to undertake "all appropriate inquiry into the previous ownership and uses of the property, consistent with good commercial or customary practice,"[12] or (3) "by any act or omission, caused or contributed to the release *974 or threatened release of a hazardous substance at the facility."[13] Only the third limitation is at issue here.
¶ 14 The Leaches contend that they qualify for this exclusion because the words "caused or contributed to the release or threatened release of a hazardous substance" imply intentional or negligent conduct, and they neither intentionally nor negligently released heating oil. The Greys contend that the plain and ordinary meaning of these words does not include any element of intent or negligence and that, by operating a heating system that released oil, the Leaches "caused or contributed to the release ... of a hazardous substance." We agree with the Greys.
¶ 15 The MTCA does not define "caused" or "contributed." We may resort to dictionary definitions to give undefined terms their plain and ordinary meaning, unless a contrary intent appears within the statute.[14]Webster's Third New International Dictionary defines "cause" as "brings about an effect or that produces or calls forth a resultant action or state" or to "bring into existence."[15]Webster's also defines "contribute" as "hav[ing] a share in any act or effect."[16] These definitions do not include any scienter element. No contrary intent appears within the MTCA. Instead, the Act generally applies a strict liability standard. We therefore conclude that a reasonably informed voter would understand from the statute's plain language that an owner of a facility who deposits hazardous substanceseven if unknowingly, unintentionally, and without negligenceis not an "innocent purchaser." That is, "the innocent purchaser defense applies only where ... [liability] status results from mere ownership."[17]
¶ 16 Here, the Leaches acknowledge that fuel oil leaked into the ground during the time they owned the property through their operation of the heating system. They "caused" or "contributed" to the release of fuel oil producing the contaminated soil requiring remediation. The "innocent purchaser" exclusion does not apply to them.[18]
¶ 17 We next address the availability of the "domestic purpose" exclusion, RCW 70.105D.040(3)(c), which provides that "any natural person" is not liable if that person
uses a hazardous substance lawfully and without negligence for any personal or domestic purpose in or near a dwelling or accessory structure when that person is: (i) A resident of the dwelling; (ii) a person who, without compensation, assists the resident in the use of the substance; or (iii) a person who is employed by the resident, but who is not an independent contractor.
¶ 18 The Leaches contend that this exclusion applies to past owners, such as themselves, who used home heating oil (the hazardous substance) lawfully and without negligence in their home heating system (the domestic purpose). The Greys disagree, contending that "domestic uses" allowed under the MTCA do not include leaking home heating oil. Again, we agree with the Greys.
¶ 19 The MTCA does not define "use." Webster's defines it as "habitual or customary practice: accustomed or usual procedure," "quality of being suitable for employment: capability of filling a need," and "to put to action or service."[19] Accordingly, the clause "uses a hazardous substance lawfully and without negligence for any personal or domestic purpose" fairly connotes the lawful and nonnegligent utilization of a hazardous *975 substance for a customary domestic purpose that, in order to fulfill this intended purpose, also involves an incidental release. Although residential heating oil is frequently stored in an underground tank and piped to a furnace to be burned for heat, this storage, piping, and burning, by design or intent, does not involve any release of oil into the ground. Ordinarily, the use of oil to heat a house does not produce leaking of oil into the ground. Thus, under the Act, use for a domestic purpose does not include leaking oil from defective underground pipes into the ground.
¶ 20 Our construction of the two exclusions at issue furthers the public policy underlying MTCA, while those advanced by the Leaches do not. It declares that its primary purpose "is to raise sufficient funds to clean up all hazardous waste sites and to prevent the creation of future hazards due to improper disposal of toxic wastes into the state's land and waters."[20] The Act provides the primary mechanism governing cleanup of fuel oil leaks from residential USTs.[21] It broadly imposes strict liability, jointly and severally, upon facility owners and operators, with a few exclusions. Construing those exclusions broadly to incorporate scienter and similar elements not expressly stated in the electorate's initiative would do violence to MTCA's express broad strict liability regime and underlying policy of promoting and restoring a healthful environment.
¶ 21 Because the Leaches' remaining contentions regarding these defenses simply recast their arguments considered in this opinion, we need not address them. We conclude that the Leaches were not "innocent purchasers" and, under the facts of this case, leaking fuel oil into the ground is not a "domestic use" under the Act.

REPSA Defense
¶ 22 Finally, we address whether the parties' REPSA bars the Greys' MTCA claim.[22]
¶ 23 The parties agree that the REPSA did not expressly allocate MTCA liability to either party. Instead, the Leaches contend that the Greys assumed the risk of heating oil contamination because they had notice of possible contamination at the time of purchase, had an opportunity to inspect for hazardous substances, and, having found none, waived their inspection contingency.[23] Although the Greys acknowledge that they had the right to inspect for hazardous materials, they contend that the REPSA specifically limited their inspection rights regarding oil storage tanks or contamination from them. Thus, they argue that their inspection, as contractually limited, was reasonable. We agree.
¶ 24 "The touchstone of contract interpretation is the parties' intent."[24] Washington courts ascertain the parties' intent "by focusing on the objective manifestations of the agreement, rather than on the unexpressed subjective intent of the parties."[25] Clear and unambiguous contracts are enforced as written.[26] Words used in a contract are given their ordinary, usual, and popular meaning unless the agreement clearly demonstrates a contrary intent.[27] "[A]mbiguity will not be read into a contract where it can *976 reasonably be avoided."[28] Interpretations giving lawful effect to all the provisions in a contract are favored over those that render some of the language meaningless or ineffective.[29] When an inconsistency arises between a general and a specific provision, the specific provision qualifies the meaning of the general provision.[30]
¶ 25 Here, an inspection addendum conditioned the REPSA as follows,
The above Agreement is conditioned on Buyer's personal approval of a written inspection of the Property and the improvements on the Property. Buyer's inspection may include, at Buyer's option, the structural, mechanical and general condition of the improvements to the Property, an inspection of the Property for hazardous materials, a pest inspection, and a soils/stability inspection.... When the terms and conditions of this Inspection Addendum have been satisfied, then this Addendum shall be deleted from and no longer a part of the Agreement.
The inspection contingency also specifically limited these inspection rights with a paragraph titled "Oil Storage Tanks," providing that "[a]ny inspection regarding oil storage tanks or contamination from such tanks shall be limited solely to determining the presence or non-presence of oil storage tanks on the Property, unless otherwise agreed to in writing by Buyer and Seller." The parties agree that Greys did not request, and Leaches did not authorize, any additional inspection.
¶ 26 The agreement provided two procedural options following the inspection. The one not selected by the parties allowed the buyer to disapprove the inspection "for any reason in Buyer's sole discretion." The option agreed upon by the parties provided,
This inspection contingency SHALL CONCLUSIVELY BE DEEMED SATSIFED (WAIVED) unless Buyer gives notice of disapproval within 14 days ... of mutual acceptance.... The notice of disapproval must (a) identify the conditions to which the Buyer objects and (b) be accompanied by a copy of the portion(s) of a written inspection report that identifies the conditions to which the Buyer objects.
If Buyer disapproves the inspection report then Seller shall have [3 days] ... after receipt of Buyer's disapproval notice to give notice that Seller (a) will correct the conditions identified in Buyer's notice, (b) offers an alternative remedy for the disapproved conditions, or (c) will not make the repairs.
And if the seller refused to make the requested repairs, the buyer could elect to terminate the agreement and seek an earnest money refund.
¶ 27 The REPSA is unambiguous. It provided the Grays with a general right to inspect for hazardous substances but expressly limited the scope of any inspection for oil storage tanks or contamination from them. The REPSA only allowed the Greys to determine a tank's presence. It expressly prohibited the Greys from conducting any testing that would have disclosed the leaking and contamination ultimately discovered. Thus, the REPSA did not permit the Greys to conduct the detailed testing the Leaches insist the Greys had a duty to perform.
¶ 28 The Leaches emphasize that they had no reason to suspect a leak in the return pipes but insist that the inspection report the Greys received provided them with the ability to either terminate the REPSA or conduct further testing. It did neither because the report did not identify any condition related to the heating system to which the Greys could object. The report stated,
There is an underground oil tank below the upper end of the concrete stairs in the backyard. This tank is apparently still in use.
....
There seem to be two sets of tracks in the concrete floor in the basement in the furnace/laundry area. They point to the possibility than an original abandoned underground *977 oil tank might exist in the front yard. Also check this item out with the present owner. If no positive answer can be obtained make absolutely certain to have the site checked by a tank locating person. If fuel oil has been leaking into the ground from an oil tank it can be an expensive mess to clean up.

¶ 29 Following their receipt of this report, the Greys confirmed with the Leaches that no abandoned tank existed in the front yard. The record contains no facts controverting this representation. The report does not identify any condition to which the Greys could object to satisfy the postinspection procedure required by the REPSA. It does not describe any leak in the heating system or evidence of contamination. In short, the inspection report provided the Grays with no ability to terminate their obligation to purchase from the Leaches or to demand further testing.
¶ 30 The Leaches further contend that the "contents of the Inspection Addendum created a genuine issue of material fact for trial on the issue of whether the Greys intended to allocate the risk of environmental liabilities when they bought the property from the Leaches." However, the Leaches do not identify the fact at issue or provide argument explaining this contention. Furthermore, "[I]nterpretation of a contract provision is a question of law only when (1) the interpretation does not depend on the use of extrinsic evidence, or (2) only one reasonable inference can be drawn from the extrinsic evidence."[31] The trial court did not rely upon any contested extrinsic evidence to interpret the parties' agreement. It properly resolved the contractual allocation issue on summary judgment.
¶ 31 Finally, the Leaches claim that the trial court erred when it failed to strike Mr. Grey's statements that neither party "intended, or at any time contemplated as part of the transaction, to transfer, allocate or assume the risk of any environmental liabilities." This argument fails. Only erroneous evidentiary rulings resulting in prejudice warrant reversal.[32] In a handwritten note added to the summary judgment order, the judge explained, "[T]o the extent that [the statements] will remain part of the record, the [court] disregards the statements [pertaining to] the intent of the buyer/seller since the [court] is not making a finding [on] the purchase & sale agreement." Thus, any error was harmless as the trial court did not rely on Mr. Grey's statements when rejecting the contract defense.

Attorney Fees
¶ 32 Both parties request attorney fees for expenses incurred at trial and on appeal. However, neither party has yet prevailed in this case. Any determination of an entitlement to fees must await the trial court's resolution of this case on its merits.

CONCLUSION
¶ 33 Under the MTCA, an "innocent purchaser" does not include a former property owner who contributed to that property's contamination, even when that contribution occurred without an intentional or negligent release of the hazardous substance. Under the facts of this case, leaking fuel oil into the ground is not a "domestic use" under the Act. The trial court erred when it denied the Greys' motion to dismiss these two MTCA defenses. The trial court correctly decided that the REPSA did not bar the Greys' MTCA claims. We reverse in part and affirm in part.
WE CONCUR: ELLINGTON and COX, JJ.
NOTES
[1] Judge Leach and the respondents are not related.
[2] Additional defenses asserted included failure to mitigate, voluntary and knowing consent, actions of third party, acts of God, cleanup not the substantial equivalent of Department of Ecology remediation, lack of notice, and costs were unreasonable and unnecessary.
[3] Quadrant Corp. v. Am. States Ins. Co., 154 Wash.2d 165, 171, 110 P.3d 733 (2005).
[4] CR 56(c); Torgerson v. N. Pac. Ins. Co., 109 Wash.App. 131, 136, 34 P.3d 830 (2001).
[5] Quality Food Ctrs. v. Mary Jewell T., LLC, 134 Wash.App. 814, 817, 142 P.3d 206 (2006).
[6] RCW 70.105D.020(10)(d).
[7] 24 TIMOTHY BUTLER & MATTHEW KING, WASHINGTON PRACTICE: ENVIRONMENTAL LAW AND PRACTICE § 15.1, at 87 (2d ed. 2007).
[8] Amalgamated Transit Union Local 587 v. State, 142 Wash.2d 183, 205, 11 P.3d 762 (2000).
[9] Amalgamated Transit, 142 Wash.2d at 205, 11 P.3d 762.
[10] Amalgamated Transit, 142 Wash.2d at 205, 11 P.3d 762 (citations omitted) (quoting State v. Thorne, 129 Wash.2d 736, 762-63, 921 P.2d 514 (1996)).
[11] RCW 70.105D.040(3)(b)(ii).
[12] RCW 70.105D.040(3)(b)(i).
[13] RCW 70.105D.040(3)(b)(iii).
[14] Am. Legion Post No. 32 v. City of Walla Walla, 116 Wash.2d 1, 8, 802 P.2d 784 (1991).
[15] WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 356 (1993).
[16] WEBSTER'S, supra, at 496.
[17] 24 BUTLER & KING, § 15.2, at 93.
[18] Our analysis is consistent with Pederson's Fryer Farms, Inc. v. Transamerica Ins. Co., 83 Wash.App. 432, 922 P.2d 126 (1996), where the court analyzed the "innocent purchaser" exemption in the context of an insurance coverage action. In dicta, the court determined that the exemption did not apply to a purchaser where circumstantial evidence established that the purchaser used the fuel tank and noted an unexplained loss of gasoline. Pederson's, 83 Wash. App. at 440-41, 922 P.2d 126.
[19] WEBSTER'S, supra, at 2523-34.
[20] RCW 70.105D.010(2).
[21] 24 BUTLER & KING, § 15.71, at 165.
[22] We have previously held that the MTCA does not prevent private parties from allocating risk for environmental cleanup. Car Wash Enters., Inc. v. Kampanos, 74 Wash.App. 537, 544-45, 874 P.2d 868 (1994).
[23] The Leaches also contend that the risk of latent tank defects fell solely to the Greys under the doctrine of caveat emptor. We did not accept discretionary review of this issue. Additionally, the Leaches failed to assert caveat emptor as an affirmative defense in their second answer to the Greys' complaint, and the Leaches did not challenge the trial court's ruling that MTCA liability defenses are limited to those enumerated in the statute.
[24] Tanner Elec. Coop. v. Puget Sound Power & Light Co., 128 Wash.2d 656, 674, 911 P.2d 1301 (1996).
[25] Hearst Commc'ns, Inc. v. Seattle Times Co., 154 Wash.2d 493, 503, 115 P.3d 262 (2005).
[26] McDonald v. State Farm Fire & Cas. Co., 119 Wash.2d 724, 733-34, 837 P.2d 1000 (1992).
[27] Hearst, 154 Wash.2d at 504, 115 P.3d 262.
[28] McGary v. Westlake Investors, 99 Wash.2d 280, 285, 661 P.2d 971 (1983).
[29] Newsom v. Miller, 42 Wash.2d 727, 731, 258 P.2d 812 (1953).
[30] Wash. Local Lodge No. 104 of Int'l Bhd. of Boilermakers v. Int'l Bhd. of Boilermakers, 28 Wash.2d 536, 541, 183 P.2d 504 (1947) (quoting RESTATEMENT (FIRST) OF CONTRACTS § 236(c) (1932)).
[31] Tanner Elec., 128 Wash.2d at 674, 911 P.2d 1301 (citing Scott Galvanizing, Inc. v. Nw. EnviroServices, Inc., 120 Wash.2d 573, 582, 844 P.2d 428 (1993)).
[32] Panorama Vill. Homeowners Ass'n v. Golden Rule Roofing, Inc., 102 Wash.App. 422, 427, 10 P.3d 417 (2000).