IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| MILL CREEK FOOT & ANKLE CLINIC, a Washington State Corporation, JNH INVESTMENTS, LLC, a Washington limited liability company, | No. 87374-1-I |
| Appellants/Cross-Respondents, | DIVISION ONE |
| | UNPUBLISHED OPINION |
| v. | |
| NATHAN HANSEN and the marital community of NATHAN AND JANE DOE HANSEN and HANSEN FOOT AND ANKLE LLC, a Washington State limited liability company, | |
| Respondents/Cross-Appellants, | |
| DR. JOSEPH N. HALL, individually and on behalf of his marital community, | |
| Defendant. | |

DÍAZ, J. — Joseph Hall, podiatrist and owner of Mill Creek Foot and Ankle Clinic (MCFAC), sued his former employee and fellow podiatrist, Nathan Hansen, alleging misappropriation of trade secrets, tortious interference, and breach of contract. Hall alleged that Hansen copied data of patients to which he had no right and used the

information to solicit the patients to his own later-formed clinic, Hansen Foot and Ankle (HFA). Hall also alleged Hansen breached one of their contracts because HFA did not pay rent to MCFAC when they shared office space. Hall argues that the trial court erred when it granted summary judgment to Hansen and dismissed all of Hall's claims. Hansen cross-appeals only as to the court's denial of attorney fees. We reverse the order granting summary judgment and remand for further proceedings. Because the issue may recur on remand, we also hold that the trial court correctly denied Hansen's motion for attorney fees despite his successful defense.

## I. BACKGROUND

In 2002, Hall founded MCFAC. In 2017, Hall hired Hansen as an MCFAC employee. Hall claims that the parties discussed the possibility that Hansen would eventually buy and take over running MCFAC. Regardless, they signed an employment contract on July 31, 2017. The parties also executed a commercial lease agreement, which they incorporated as an exhibit to the contract, and which would take effect at a later date. The parties anticipated that, when certain conditions were met and the employment agreement terminated, the lease agreement would commence. Hansen's separate to-be-formed clinic, HFA, would become the lessee of MCFAC.

The lease agreement became effective on March 1, 2018, and remained effective for three years. During this time, MCFAC sometimes referred existing or new patients to HFA for appointments. In 2021, according to Hall, the parties still had not reached an agreement regarding Hansen's purchase of MCFAC. The parties renewed the lease with some changes on March 1, 2021.

Hall then accused Hansen of copying files for patients who were not his. On

December 10, 2021, Hall sent a cease-and-desist letter, which provided a list of patient files that Hall agreed Hansen had a right to take. The cease-and-desist letter also notified Hansen that HFA was behind on rent. HFA eventually moved to a new location.

Hall sued Hansen for misappropriation of trade secrets and tortious interference with a business expectancy, alleging that Hansen had used Hall's confidential patient files to solicit patients to HFA. Hall also claimed breach of contract due to Hansen's failure to make rent payments required by the lease.

After discovery, Hansen moved for summary judgment. The trial court granted the motion and dismissed Hall's claims. Hall timely appeals.

## II.    ANALYSIS

We review summary judgment orders de novo, while "view[ing] all facts and reasonable inferences in the light most favorable to the nonmoving party."[1] TracFone, Inc. v. City of Renton, 30 Wn. App. 2d 870, 875, 547 P.3d 902 (2024). Washington courts employ a two-step burden-shifting analysis for summary judgment motions. Id. First, the "party moving for summary judgment bears the initial burden of showing that there is no disputed issue of material fact." Haley v. Amazon.com Servs., LLC, 25 Wn. App. 2d 207, 216, 522 P.3d 80 (2022). Second, the "burden then shifts to the nonmoving party to present evidence that an issue of material fact remains." Id.

A.    Misappropriation of Trade Secrets

---

[1] In the trial court's order granting Hansen's motion for summary judgment, it makes multiple "findings of fact." We review orders on summary judgment de novo and give no weight to the trial court's factual findings. See Haley v. Amazon.com Servs., LLC, 25 Wn. App. 2d 207, 234, 522 P.3d 80 (2022) ("When the trial court does make findings of fact without following the procedures dictated in CR 56(d), its findings are nullities.") (citing CR 56(d)).

The Uniform Trade Secrets Act (UTSA), chapter 19.108 RCW, "codifies the basic principles of common law trade secret protection" by which a plaintiff can receive actual damages for misappropriation of trade secrets. Ed Nowogroski Ins., Inc. v. Rucker, 137 Wn.2d 427, 438, 971 P.2d 936 (1999). "We review interpretation of the UTSA de novo as a question of law, while we review whether specific information satisfies the statute's definition of a 'trade secret' in any given case as a question of fact." Biochron, Inc. v. Blue Roots, LLC, 26 Wn. App. 2d 527, 547, 529 P.3d 464 (2023).

Hall argues the trial court erred in granting summary judgment as to his claim that Hansen misappropriated trade secrets. We agree because there are fact issues regarding at least the following questions each of which is germane to Hall's UTSA claim:

1. After Hansen was no longer an employee, did Hall take "reasonable efforts" to protect the records as required for the records to be trade secrets?
2. Did Hansen "misappropriate" the records that he took?
3. Did Hansen copy medical records to which he was not entitled, and which records?

Hansen argues Hall failed to identify fact issues as to these questions. We address Hansen's arguments as to each question below.

1. Existence of a Trade Secret

Hansen claims that Hall did not present evidence that the copied patient records were trade secrets. We disagree.

"Trade secret means information . . . that: (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." RCW 19.108.010(4).

Hall bears the burden of showing that these records are trade secrets. Lyft, Inc. v. City of Seattle, 190 Wn.2d 769, 781, 418 P.3d 102 (2018). At oral argument, Hansen did not contest that the patient records generally are a source of economic value. Wash. Ct. of Appeals oral argument, Mill Creek Foot v. Hansen, No. 87374-1-I (Jan. 13, 2026), at 15 min., 7 sec. through 15 min., 38 sec. video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2026011280/?eventID=2026011280. Instead, Hansen argued that Hall had offered only conclusory statements that the records actually have economic value. Id. This is inaccurate. Hall's declaration—that MCFAC uses the patient information to "contact these pre-existing patients about ongoing and future treatment" and to "market pre-existing patients about new treatment options and about new development at MCFAC"— is sufficient to create a genuine issue of material fact that the records are an actual or potential source of value. Hall has established fact issues regarding the first prong of the trade secrets statute, RCW 19.108.010(4)(a).

Hansen argues that the second prong of the UTSA is not met because Hall did not use reasonable efforts to maintain the secrecy of the records. Both MCFAC and HFA kept medical records on a database called TRAKnet, for which Hall was the account holder and HFA paid half the cost. The system protected patient data as required by the federal Health Insurance Portability and Accountability Act of 1996 (HIPAA), Pub. L. No. 104-191, 110 Stat. 1936, which limits disclosure of patients' health information. New patients of either MCFAC or HFA were entered into the same database and saved under the same account. Using their shared account, Hansen and Hall could access medical records for patients that the other had treated.

Hansen claims that, because MCFAC and HFA shared one TRAKnet account and shared access to all patient records, even after he ceased being an employee, MCFAC did not take reasonable measures to protect the records from HFA.

But there is no requirement for absolute secrecy under the UTSA. Biochron, 26 Wn. App. 2d at 549. Controlled disclosure "can constitute reasonable efforts to maintain the secrecy of trade secrets." Id. at 551. Viewing the facts in the light most favorable to MCFAC, "a reasonable mind could conclude that their disclosure of trade secrets was made with efforts that were reasonable under the circumstances to maintain its secrecy." Id. at 549.

Hansen claims that the protection TRAKnet provided was for HIPAA purposes and does not support Hall's claim that the data is a trade secret. Hansen cites an order denying summary judgment from the District Court for the Western District of Washington, which held that required HIPPA protections were insufficient to establish that data is a trade secret. Traverse Therapy Servs., PLLC v. Sadler-Bridges Wellness Grp., PLLC, C23-1239, 2024 WL 1701970, at *2 (W.D. Wash. Apr. 19, 2024) (court order) (finding that "Traverse conflates the mere existence of a patient list that it is legally required to keep confidential per the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") with a trade secret.")

But Hansen was unaware, at the time of filing his brief, that the Ninth Circuit Court of Appeals has since reversed this ruling. Traverse Therapy Servs., PLLC v. Sadler-Bridges Wellness Grp., PLLC, 24-3931, 2025 WL 2017467, at *1 (9th Cir. July 18, 2025). The court held that whether specific information is a trade secret is a fact question, and that "an additional legal obligation under HIPAA to keep the client list confidential, while

perhaps worthy of consideration by a trier of fact, is not dispositive as to whether the client list was a trade secret." Id. We agree.

A jury could find that Hall's use of the TRAKnet system constituted "reasonable efforts" for protecting trade secrets that MCFAC derived economic value from. We therefore hold that Hall established genuine issues of material fact as to whether the patient files are trade secrets. See Biochron, 26 Wn. App. 2d at 547.

2. Misappropriation

Hansen next argues that, even if the disputed records were trade secrets zealously maintained, Hall cannot show that Hansen "misappropriated" them. We reject Hansen's overly narrow and inapplicable definition of misappropriation.

"Generally, taking an employer's confidential customer list without permission is a trade secret misappropriation." Thola v. Henschell, 140 Wn. App. 70, 78, 164 P.3d 524 (2007).[2] One definition of misappropriation is "[a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." RCW 19.108.010(2)(a). Hansen argues that, for this definition to apply, he would have had to acquire the secret from some other third party. We reject this reading of the statute.

Nearly forty years ago, our Supreme Court held that RCW 19.108.010(2)(a) applied when one company acquired trade secrets as a part of a business contract and then continued to use the secrets after the contract ended. Boeing Co. v. Sierracin Corp., 108 Wn.2d 38, 46, 738 P.2d 665 (1987) ("Sierracin's actions in using the Boeing

---

[2] Although we decline to follow Thola's analysis for UTSA preemption as discussed below, we find the opinion is otherwise well-reasoned in applying the UTSA to confidential client or patient information.

drawings . . . violated this statute."). A reasonable jury could find that, by copying records that Hall owned without Hall's consent, Hansen acquired trade secrets "by improper means" and therefore misappropriated trade secrets as defined by the statute.

Moreover, that is not the only way Hall claims Hansen misappropriated the records. Another definition of misappropriation is "use of a trade secret . . . by a person who used improper means to acquire knowledge of the trade secret." RCW 19.108.010(2)(b)(i). Hall asserted that Hansen used trade secrets when he contacted MCFAC patients to "bolster HFA business."

In the employment contract, Hansen agreed that once his employment ended, he would not solicit "any existing patient" that he had treated at MCFAC to use services at his new practice, other than by placing an "advertisement in a telephone directory." Hansen acknowledges that he sent postcards with HFA's new location to some patients. He insists they were only patients that Hall had conceded to be HFA patients.

But Hall presented a declaration of Janice Binks stating that she received "written correspondence from Dr. Hansen" informing her of HFA's new location despite not contacting him and having no appointment scheduled. Hansen did not assert that Binks was on Hall's approved patient list. Instead, Hansen responded that sending a postcard with his new office location was not solicitation.

Viewing the facts in the light most favorable to Hall, we hold that he has met his burden to present evidence creating genuine issues of material fact regarding (a) whether Hansen misappropriated trade secrets by copying records and (b) whether he did so by contacting and soliciting MCFAC patients.

3. Ownership of Patient Records

Perhaps more broadly, Hansen next argues that he could not have misappropriated the records taken because he was an "owner" of the records. We hold that Hall has established genuine issues of material fact as to whether Hansen was entitled to medical records, and, if so, which records.

Hansen claims that he owned all records for patients he had treated and, therefore, he was right to copy all such records. In support, he cites a Washington State Medical Association (WSMA) ethics opinion stating that patient medical records are the "personal property" of the physician providing treatment.

But Hansen cites no legal authority that supports the argument that, despite the absence of any such provision in a contract between landlord and tenant, he owned the patient files of any patient he saw, whether exclusively, concurrently, or derivatively. "Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none." DeHeer v. Seattle Post-Intelligencer, 60 Wn.2d 122, 126, 372 P.2d 193 (1962).

Moreover, as a general matter, Hansen's argument is inconsistent with Thola, 140 Wn. App. at 76, a case in which a chiropractor misappropriated the client list of her first employer and used the information to solicit clients to her new employer. The court held that the new employer could be vicariously liable for the employee's UTSA violation, implicitly holding that the client list was a trade secret. Id. at 90. If, as Hansen claims, a treating provider owns the medical records of patients they treat and may legally use the records as they please, then the client list in Thola could not have been a trade secret.

Although we reject Hansen's argument that he legally owned *all* records for *all* patients he treated, we hold that it is undisputed, per his employment contract, he did own

9

some of the records. "Clear and unambiguous contracts are enforced as written." Grey v. Leach, 158 Wn. App. 837, 850, 244 P.3d 970 (2010). The courts give "words in a contract their ordinary, usual, and popular meaning unless the entirety of the agreement clearly demonstrates a contrary intent." Hearst Commc'ns, Inc. v. Seattle Times Co., 154 Wn.2d 493, 504, 115 P.3d 262 (2005).

The employment agreement signed in 2017 defines the circumstances of its termination, first stating: "It is anticipated by the Parties this Employment agreement will remain in effect . . . until such time as Employee is ready to conduct business under a separate professional service corporation or limited liability company from the same location as Employer pursuant to the terms of the Commercial Lease agreement in Exhibit A."

There is no dispute that the stated conditions precedent to the termination of the employment contract occurred. The commercial lease agreement became effective on March 1, 2018. HFA was incorporated as a limited liability company and, per the lease, would share and conduct business from MCFAC's property. Therefore, Hansen's employment terminated on March 1, 2018.[3]

The employment contract further stated that "[u]pon termination of this agreement and commencement of the lease agreement in exhibit A . . . *the lessee will have all rights to patient records that the employee had seen during the term of the employment agreement*." The plain meaning of the contract indicates that, as a matter of law, on

---

[3] Due to our plain reading of the employment contract, we reject Hall's argument that Hansen continued to be an MCFAC employee or a quasi-employee after the contract terminated. Because we reverse in favor of Hall for other reasons, we need not address Hall's arguments that Hansen owed a duty of confidentiality because he was a partner, joint venturer, agent, licensee, or party to some other business relationship.

March 1, 2018, Hansen became the owner of the patient records for patients that he had seen during his employment.

We reject Hall's argument that ownership of the patient records is distinct from a right to contact the patient. Wash. Ct. of Appeals oral argument, supra at 8 min., 54 sec. through 9 min., 31 sec. The plain meaning of "all rights to patient records" indicates that Hansen would control the records and could use them however he decided to. See Oliver v. Flow Int'l Corp., 137 Wn. App. 655, 660, 155 P.3d 140 (2006) (holding that party who sold "all rights" to an invention could not afterwards "insert new obligations" on the buyer to manufacture and market the invention); Hearst Commc'ns, 154 Wn.2d at 504 ("We generally give words in a contract their ordinary, usual, and popular meaning.").

Therefore, Hansen could rightly copy those records for those patients he saw during his employment period. However, neither party identifies in any rigorous manner the precise universe of those records. Hall declared that "nearly 99 percent of the patient files [Hansen] copied were patients Dr. Hansen treated after his MCFAC employment and during the terms of the commercial lease agreements." To the extent there is any disagreement about the identify of such patients—albeit minor—there is a genuine issue of material fact to be resolved at trial, as neither party identifies who they are nor establishes that they were seen while Hansen was an employee.

Hall concedes that Hansen owns the records for new patients that HFA acquired after the second lease became effective on March 1, 2021, meaning they are not misappropriated trade secrets. Hall provided a list of such patients to Hansen. But again, because the parties do not identify with any rigor which patients fall into which category, there are genuine issues of material fact to be resolved at trial about which of Hansen's

11

patients from the commencement of the second lease are his.

Similarly, the parties make competing factual claims as to whether Hansen was the originating and exclusive provider for patients seen while the first lease was effective, i.e., from March 1, 2018, to March 1, 2021. Hansen never identifies, with citations to the record, which patient files he exclusively treated during the period of the first lease. Hall has met his burden by presenting evidence that at least some of the records that Hansen copied were owned exclusively by MCFAC. Therefore, there is a genuine issue of material fact as to whether Hansen copied records that he did not own during that time period as well.

In short, when viewing the evidence in the light most favorable to Hall, there is a genuine issue of material fact as to whether Hansen copied records which were trade secrets and to which he was not entitled. TracFone, 30 Wn. App. 2d at 875. Thus, the trial court erred in dismissing Hall's USTA claim on summary judgment.

B.      Tortious Interference

Hall next argues the trial court erred in granting summary judgment in favor of Hall on his tortious interference claim. Hansen argues the claim is preempted by the misappropriation of trade secrets claim. We agree with Hall.

The UTSA "displaces conflicting tort, restitutionary, and other law of this state pertaining to civil liability for misappropriation of a trade secret" but does not preempt "[c]ontractual or other civil liability or relief that is not based upon misappropriation of a trade secret." RCW 19.108.900. Therefore, a plaintiff "may not rely on acts that constitute trade secret misappropriation to support other causes of action." Ed Nowogroski Ins., Inc. v. Rucker, 88 Wn.App. 350, 358, 944 P.2d 1093 (1997), aff'd, 137 Wn.2d 427, 971

P.2d 936 (1999).

Washington courts are split on whether to apply an "elements-based" test or a "factual preemption" test to assess UTSA preemption. See SEIU Healthcare Nw. Training P'ship v. Evergreen Freedom Found., 5 Wn. App. 2d 496, 505-08, 427 P.3d 688 (2018). In Thola, Division II of this court adopted a three-part factual preemption test. 140 Wn. App. at 82. The court, "(1) assess[es] the facts that support the plaintiff's civil claim; (2) ask[s] whether those facts are the same as those that support the plaintiff's UTSA claim; and (3) hold[s] that the UTSA preempts liability on the civil claim unless the common law claim is factually independent from the UTSA claim."[4] 140 Wn. App. at 82.

Division I of this court has declined to follow Thola and held that our Supreme Court's decision in Boeing instead applies an elements-based test. SEIU Healthcare, 5 Wn. App. 2d at 505-6. In the elements-based test, "a common law claim is not preempted if the elements require some allegation or factual showing beyond those required under the UTSA." Id. at 506 (quoting Thola, 140 Wn. App. at 82 n.5.).

In Boeing, the court found that, because a confidentiality claim requires a confidential relationship, which is not required for a UTSA claim, the UTSA does not preempt a claim for breach of confidentiality. See 108 Wn.2d at 48 ("The act merely displaces conflicting tort, restitutionary and other law regarding civil liability for misappropriation. The United States Supreme Court has held that proof of trade secrets

---

[4] The court in Thola explicitly declined to adopt an elements-based test. Thola, 140 Wn. App. at 82 n.5. A majority of UTSA jurisdictions use a factual preemption test. Id. at 82. See, e.g., Lucini Italia Co. v. Grappolini, 231 F.Supp.2d 764, 768 (N.D.Ill.2002); Savor, Inc. v. FMR Corp., 812 A.2d 894, 897 (Del. 2002); Mortgage Specialists, Inc. v. Davey, 153 N.H. 764, 778, 904 A.2d 652, 665 (2006). Some jurisdictions have adopted a similar elements-based test to the analysis we apply here. See, e.g., Powell Products, Inc. v. Marks, 948 F. Supp. 1469, 1474 (D. Colo. 1996).

is not required for breach of confidentiality claims, which may be brought independently of trade secrets claims. A confidential relationship alone is enough to prohibit disclosure. Furthermore, a contractual provision designed to protect against disclosure would also not be subject to displacement by the Uniform Trade Secrets Act." (citations omitted)).

Boeing did not explicitly adopt an elements-based test, but the court's reasoning "resembles an elements-based analysis." SEIU Healthcare, 5 Wn. App. 2d at 508. The court in Boeing did not "assess the facts." Id. Division I of this court has held, "Boeing indicates the Uniform Trade Secrets Act is preemptive only if an examination of the allegedly preempted cause of action shows that it is founded on a law 'regarding civil liability for misappropriation.'" Id. (citing Boeing, 108 Wn.2d at 48). "Until or unless the Washington Supreme Court overrules Boeing and adopts the Thola analysis, Boeing controls." Modumetal, Inc. v. Xtalic Corp., 4 Wn. App. 2d 810, 831, 425 P.3d 871 (2018). We therefore apply an elements-based analysis in determining UTSA preemption in this case.

At oral argument, Hansen argued that Boeing should be interpreted narrowly and only applied to common law confidentiality claims. Wash. Ct. of Appeals oral argument, supra at 11 min., 35 sec. through 12 min., 40 sec. We disagree and apply the same reasoning the Supreme Court used in Boeing to determine whether any common law claim is preempted under RCW 19.108.900.

An elements-based analysis allows this court to address the issue of preemption as a matter of law, before the questions of whether a trade secret exists or whether

14

misappropriation occurred have been answered.[5] Tortious interference requires "a known business relationship," an element not included in a trade secret claim. Thola, 140 Wn. App. at 82. Therefore, Hall's claim of tortious interference is not preempted by his UTSA claim.

Hansen also claims that dismissal of the tortious interference claim was proper because Hall does not dispute the fact that the only patients that Hansen contacted were HFA patients. See Wash. Ct. of Appeals oral argument, supra at 13 min., 55 sec. through 14 min., 55 sec. As discussed above, Hall disputed this fact with the declaration of Janice Binks stating that Hansen had contacted her. Therefore, there is a genuine issue of material fact as to whether Hansen improperly interfered with Hall's business expectancy with MCFAC patients.

We reverse the trial court's dismissal of the tortious interference claim and remand for further proceedings consistent with this opinion.

C.      Breach of Contract Claim

Next, Hall argues the trial court erred in dismissing his breach of contract claim. Hansen asserts dismissal was warranted because there is no genuine issue of material fact as to his affirmative defenses. We agree with Hall.

Per the lease, HFA was to pay 10 percent of its gross revenue to MCFAC as rent. CP 210. "In the event Lessee shall default in the payment of the monthly rent as provided herein, Lessor shall *promptly* so notify Lessee in writing, and failure of Lessee to cure

---

[5] Some courts in other jurisdictions have held that a court must first determine whether a trade secret exists before addressing UTSA preemption. See, e.g., Callaway Golf v. Dunlop Slazenger Group Americas, 295 F.Supp.2d 430, 437 (D.Del.2003); Stone Castle v. Friedman, Billings, Ramsey & Co., 191 F.Supp.2d 652, 659 (E.D.Va.2002). We decline to follow that approach based on the procedural posture of this matter.

such default within 20 days after receipt of such notice shall . . . work as forfeiture of this Agreement, or Lessor may enforce performance in any manner provided by law." (emphasis added). Hansen does not dispute Hall's assertion that HFA did not pay the rent from March 2018 to March 2021.

The trial court held that Hall had not satisfied the condition precedent of written default notice. The court also held that MCFAC had waived the payments.[6] The trial court therefore dismissed this claim. Hansen asserts that dismissal was proper due to his affirmative defenses of lack of notice, waiver, and equitable estoppel. We address each argument in turn.

1. Notice

Unless waived, strict compliance with a contractual notice requirement is a condition precedent for a breach of contract claim. See Mike M. Johnson, Inc. v. County of Spokane, 150 Wn.2d 375, 391, 78 P.3d 161 (2003). When interpreting a contract, the court "may not create a contract for the parties which they did not make themselves. It may neither impose obligations which never before existed, nor expunge lawful provisions agreed to and negotiated by the parties." In re Marriage of Mudgett, 41 Wn. App. 337, 341, 704 P.2d 169 (1985). "Summary judgment as to a contract interpretation is proper if the parties' written contract, viewed in light of the parties' other objective manifestations, has only one reasonable meaning." GMAC v. Everett Chevrolet, Inc., 179 Wn. App. 126,

_____

[6] The court relied on Hall's declaration and on some type of acknowledgement by Hall at oral argument that Hall's declaration states that he had informed Hansen he would not pursue payment until he was financially stable, but nowhere did Hall promise to waive the debt. We do not read such a concession in Hall's declaration. The record of proceedings is not presented to this court, so we cannot assess whether Hall made any concession at oral argument.

135, 317 P.3d 1074 (2014). If the meaning is ambiguous when viewed in context, there is a question of fact. Id.

On December 10, 2021, in the cease-and-desist letter, Hall said, "As part of the rent, HFA agreed to pay MCFAC 10 percent of gross revenue collected every three months. HFA never did so. Pursuant to ¶ 8, HFA is subject to late fees on unpaid rent obligations."

Hall claims that the cease-and-desist letter satisfied the written notice requirement. Hansen argues that the letter did not provide notice because it did not include the default amount or a deadline for the default to be cured. The lease does not require the notice to include such provisions, and the court may not add such terms to the contract. In re Mudgett, 41 Wn. App. 337, 341, 704 P.2d 169 (1985).

The letter did provide written notice of HFA's default on rent payments. However, the record indicates that HFA was in continual or rolling default for about three years before the letter. The lease required that MCFAC "promptly" notify HFA.

A definition of "promptly" is not provided in the lease. Courts may turn to the dictionary definition of an undefined contract term to assess its meaning. Seattle Tunnel Partners v. Great Lakes Reins. (UK) PLC, 18 Wn. App. 2d 600, 611, 492 P.3d 843 (2021), aff'd, 200 Wn.2d 315, 516 P.3d 796 (2022). Merriam-Webster defines "prompt" as "performed readily or immediately." MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/prompt (last visited Dec. 31, 2025). While no trier of fact could conclude that Hall provided notice "immediately" after the first month's failure to pay the rent, there is a genuine issue of material fact whether Hall did so readily for some or all of the rent payments.

17

2. <u>Waiver</u>

Hansen next argues that Hall expressly waived any claim to the unpaid rent. "A waiver is the intentional and voluntary relinquishment of a known right." <u>224 Westlake, LLC v. Engstrom Prop., LLC</u>, 169 Wn. App. 700, 714, 281 P.3d 693 (2012). Waiver of a contractual right is disfavored and the party asserting waiver has a heavy burden of proof. <u>Brundridge v. Fluor Fed. Servs. Inc.</u>, 109 Wn. App. 347, 356, 35 P.3d 389 (2001). Waiver can be express or implied. <u>224 Westlake</u>, 169 Wn. App. at 714. Whether there is an express waiver is a question of fact, but whether there is an implied waiver is a mixed question of fact and law. <u>Reynolds Metals Co. v. Elec. Smith Const. & Equip. Co.</u>, 4 Wn. App. 695, 700, 483 P.2d 880 (1971).

> On March 1, 2021, Hall emailed the following:
>
> According to our contract from the past 3 years you were supposed to pay the following but did not:
>
> 1. 10% of Gross revenue: I am approximating this would have been close to 100 K total over the past 3 years. I am not going to pursue retrieving this money as we verbally agreed not to do this but wanted you to realize that I saved you a ton of money already these past 3 years.
>
> 2. Personal property tax on the building: $4,375 per year x 3 years= $13,125 owed. Again, I do not plan on pursuing this owed money but I could.

Hall claims that in this email he "agreed to forbear collection for a time" but did not waive all claims to the rent owed. Hansen claims that it was an unconditional waiver offered as "an inducement" for HFA to enter another lease with MCFAC, but Hansen does not offer facts to support this allegation.[7]

---

[7] Hansen states that Hall "orally waived" the rent payments as an inducement, and in Hall's email he admits that he "verbally agreed not to" pursue the rent payments. The record does not specify the facts of the verbal agreement and so we cannot determine whether such facts would resolve the question of waiver.

Express waivers are a question of fact.  Reynolds Metals, 4 Wn. App. at 700.  Whether a statement is an express waiver is a question of fact unless "reasonable minds could reach but one conclusion."  Renfro v. Kaur, 156 Wn. App. 655, 661, 235 P.3d 800 (2010) (quoting Harmony at Madrona Park Owners Ass'n v. Madison Harmony Dev., Inc., 143 Wn.App. 345, 361, 177 P.3d 755 (2008)).

A trier of fact could reasonably understand Hall's language, "I am not going to pursue retrieving this money" and "I do not plan on pursuing this owed money, but I could" to be intended as a reminder of a possible legal claim instead of a waiver of the claim.  We reverse and remand for the jury to determine whether those statements were express waivers.  See Reynolds Metals, 4 Wn. App. at 700.

3. Equitable Estoppel

Finally, Hansen asserts that the doctrine of equitable estoppel precludes the breach of contract claim.  The trial court did not reach the issue of equitable estoppel, as it dismissed the claim on other grounds.

The doctrine of equitable estoppel requires that a party be held to their position that another party, in good faith, relied on, if allowing the party to change their position would be inequitable.  Cornerstone Equip. Leasing, Inc. v. MacLeod, 159 Wn. App. 899, 907, 247 P.3d 790 (2011).  Equitable estoppel requires: (1) an admission, statement, or act inconsistent with a claim afterward asserted; (2) action by another in reasonable reliance on that act, statement, or admission; and (3) injury to the party who relied if the court allows the first party to contradict or repudiate the prior act, statement, or admission. Id.

Equitable estoppel is not favored, and Hansen bears the burden of showing, by

19

clear, cogent, and convincing evidence, that he reasonably relied on Hall's alleged waiver. Cornerstone Equip. Leasing, 159 Wn. App. at 907. Generally, justifiable reliance is a question of fact. Id. at 905. "Summary judgment is appropriate if reasonable minds could reach but one conclusion." Id.

To prevail on a claim of equitable estoppel, Hansen asserts that he relied on Hall's waiver when he decided to not break the lease and seek other employment. A reasonable jury could find that this evidence does not rise to the level of clear, cogent, and convincing evidence of reasonable reliance. Hall asserts that, in context, the agreement was to temporarily forbear payment to help Hansen to continue practicing. There is a genuine dispute of material fact as to whether Hansen would have been justified in relying on the statement as an express waiver. Therefore, summary judgment cannot properly be granted on these grounds.

Hansen also claims that summary judgment was proper since Hall never disputed the equitable estoppel claim. Since Hall's declaration in support of response to summary judgment offered facts that precluded summary judgment on equitable estoppel grounds, this argument also fails.

Thus, there are genuine issues of material fact as to each of Hansen's affirmative defenses. The trial court erred in dismissing Hall's breach of contract claim on this basis.

D.    Attorney Fees

Hansen cross-appeals on the issue of attorney fees. He claims the court erred when it denied his request for attorney fees. Because we reverse the trial court's order granting summary judgment in Hansen's favor, he is no longer able to argue he was the prevailing party. We nevertheless reach the issues presented on his cross-appeal

20

because they may recur on remand.  See In re Marriage of Rockwell, 157 Wn. App. 449, 454, 238 P.3d 1184 (2010) (addressing whether prejudgment interest may properly be awarded "[b]ecause this issue is likely to recur on remand").  Hansen asserted two grounds for attorney fees: bad faith for the UTSA claim and the contract language of the lease.  Under the UTSA, "If a claim of misappropriation is made in bad faith . . . the court may award reasonable attorney's fees to the prevailing party." RCW 19.108.040.  Nothing in the record indicates that Hall's claim of misappropriation was made in bad faith.  This argument is unavailing.

As to the latter, the lease does not provide a basis for attorney fees in this case. "Clear and unambiguous contracts are enforced as written."  Grey v. Leach, 158 Wn. App. 837, 850, 244 P.3d 970 (2010).  The courts give "words in a contract their ordinary, usual, and popular meaning unless the entirety of the agreement clearly demonstrates a contrary intent."  Hearst Commc'ns, Inc., 154 Wn.2d at 504.

The lease states, "Any dispute involving any obligation or the performance of any duty arising under or related to this Agreement shall be brought in Snohomish County Superior Court and subject to the Snohomish County local mandatory Arbitration rules. The prevailing party *in any such arbitration* shall be entitled to recover court costs, reasonable attorneys' fees and out-of-pocket expenses associated with such arbitration from the non-prevailing party."  (emphasis added).  The language is clear and unambiguous.  No arbitration took place in this case.  Therefore, the contract language that Hansen relies on does not apply and the court did not err in denying attorney fees on this basis.

Because we reject Hansen's argument that he is entitled to attorney fees based

21

on either bad faith or the language of the lease, there are no statutory or contractual grounds for attorney fees on appeal.

III.     CONCLUSION

We reverse the trial court's dismissal of Hall's claims and remand the case for further proceedings consistent with this opinion.


WE CONCUR:                                    Díaz, J.


Feldman, J.                                    , ACJ